(No. 30365.—

THE CITY OF CHICAGO, Appellee, *vs.* ARTHUR TERMINI-
ELLO, Appellant.

*Opinion filed March 18, 1948—Rehearing denied May 13, 1948.*

24

MAXIMILIAN J. ST. GEORGE, and ALBERT W. DILLING, both of Chicago, for appellant.

BENJAMIN S. ADAMOWSKI, Corporation Counsel, (L. LOUIS KARTON, A. A. PANTELIS, and HARRY A. ISEBERG, of counsel,) all of Chicago, for appellee.

Mr. JUSTICE WILSON delivered the opinion of the court:

A jury in the municipal court of Chicago found the defendant, Arthur W. Terminiello, guilty of the offense of disorderly conduct, in violation of a city ordinance. Judgment was rendered on the verdict and defendant was fined $100. Upon direct appeal, we transferred the cause to the Appellate Court for the First District, no constitutional question being presented so as to confer jurisdiction

on this court. (*City of Chicago* v. *Terminiello,* 396 Ill. 41.) The Appellate Court affirmed. (*City of Chicago* v. *Terminiello,* 332 Ill. App. 17.) We have allowed defendant's petition for leave to appeal.

The action grows out of a meeting held in an auditorium in Chicago on February 7, 1946. The meeting was held under the auspices of the Christian Veterans of America, Frederick Kister, director. Printed invitations, signed by Gerald L. K. Smith, were sent to persons on a mailing list. Each invitation was accompanied by several cards of admission. The invitations announced that Father Arthur W. Terminiello was the "radio Priest of the South;" that he "is responsible more than any other single individual in America for bringing about the investigation of the Pearl Harbor scandal;" that he "has been referred to by many as the Father Coughlin of the South," and that "the same people who hate Father Coughlin hate Father Terminiello" and "have persecuted him, hounded him, threatened him." With reference to the extra admission cards, the notices read as follows: "These cards will go like hot cakes! Everyone you see will want them. Therefore, make wise distribution of them." Each card states that it will admit the bearer and one friend and that admission is by card only.

The meeting was well attended. Persons desiring to hear defendant speak filled the 800-seat auditorium to capacity, others stood in the rear and about 250 were turned away. An hour before the meeting, a strong picket line was formed in front of the auditorium. The number in the picket line gradually increased to several hundred and a crowd estimated at 1000 persons gathered outside to protest the meeting. Despite the presence of approximately seventy policemen, a number of disorders occurred. Some persons braved the picket line. Others were escorted by police. Friends were separated. Clothing was torn. Missiles of all kinds were thrown at the building. Twenty-

eight windows were broken. Stench bombs fell on the steps to the auditorium. Forty boys in a flying wedge bowled over policemen forming a cordon on the steps and almost broke into the hall. Other attempts were made to rush the meeting. Part of the mob tried to bash down the rear door of the auditorium. All during the evening there was much noise. Cries of "Nazis," "damned Fascists" and "Hitlers" greeted those attending the meeting and frequently the crowd shouted and chanted in unison.

Several persons took tickets at the door. Most of those attending the meeting entered by card of admission. Many came in without cards. The mailing list of persons to whom invitations and cards had been sent was not introduced in evidence nor was there any testimony relative to the source and composition of the list.

Smith opened the meeting and was followed by Kister and Terminiello. A transcript of defendant's speech was introduced in evidence. The following excerpts are illustrative: "Now, I am going to whisper my greetings to you, Fellow Christians. * * * I suppose there are some of the scum got in by mistake, so I want to tell a story about the scum. * * * nothing that I would say can begin to express the contempt I have for that howling mob on the outside. * * * And nothing I could say tonight could begin to express the contempt I have for the slimy scum that got in by mistake. * * * The subject I want to talk to you tonight about is the attempt that is going on right outside this hall tonight, the attempt that is going on to destroy America by revolution. * * * millions more through Eastern Europe at the close of the war are being murdered by those murderous Russians, hurt, being raped and sent into slavery. That is what they want for you, that howling mob outside. * * *

"All of it [Communism in America] can be traced into the great Red menace by the New Deal in Washington. * * * First of all we had Queen Eleanor. * * * Then

we have Henry Adolph Wallace  *   *   *.  Now, my friends, they are planning another ruse  *   *   *  are going to try to put into Mr. Edgar Hoover's position a man by the name of George Schwarzwald.  *   *   *  Didn't you ever read the Morgenthau plan for the starvation of little babies and pregnant women in Germany?  *   *   *  Why should every child in Germany today not live to be more than two or three months of age?  Because Morgenthau wants it that way, and so did F.D.R.  *   *   *  You will know who is behind it when I tell you the story of a doctor in Akron, Ohio.  He boasted to a friend of mine within the last few days, while he was in the service of this country as a doctor, he and others of his kind made it a practice—now, this was not only one man—made it a practice to amputate the limbs of every German they came in contact with whenever they could get away with it; so that they never could carry a gun.  *   *   *  The nurses, they tell me, are going to inject diseases in them, syphilis and other diseases in every one that came there, all of one race, all non-Christians.  *   *   *

"Now, let me say, I am going to talk about—I almost said, about the Jews.  Of course, I would not want to say that.  However, I am going to talk about some Jews. *   *   *  We must take a Christian attitude.  I don't want you to go from this hall with hatred in your heart for any person, for no person.  *   *   *  We must love every person  *   *   *.  We must not love particularly the criminals among those people.  *   *   *  we must condemn the criminals even if they are Jews.  We must condemn Communists wherever we find them  *   *   *.  But the moment we point to a man and say that man is a Communist, or that his name happens to be Ginsberg, then we are considered to be anti-Semitic.  *   *   *  Now this danger which we face—let us call them Zionist Jews if you will, let's call them atheistic, communistic Jewish or Zionist Jews, then let us not fear to condemn them.  *   *   *  We must

not lock ourselves up in an upper room for fear of the Jews. I speak of the Communistic Zionistic Jew, and those are not American Jews. We don't want them here; we want them to go back where they came from. We are going to stand one and all together and form a solid phalanx of courage and loyalty and strength, and oppose every attempt to breach freedom of speech in America, every attempt to dilute Christianity in America, every attempt to undermine the morality of America, every attempt to shed American blood to promote Zionism in America * * *."

The testimony relative to the reaction of the audience during the speech is conflicting. The complaining witness, Ira Latimer, stated that the audience did not merely cheer and applaud; that the people were disturbed and angry, and that the reference to the actions of non-Christian doctors and nurses in Germany drew "Ahs," "Ohs" and other expressions of anger from the audience. Lucille Lipman, a Quaker of Irish extraction, testified that when defendant said there was no crime too great for the Jews to commit, the woman next to her said, "Yes the Jews are all killers, murderers. If we don't kill them first, they will kill us," and that, at the mention of the amputations performed on German prisoners, the people around her said "Oh" and "Ah" and "Isn't that terrible." On cross-examination, Miss Lipman related that she was so riled and wrought up at all the lies told she was tempted to commit violence. The last witness for plaintiff, Michael Karel, a Jew, testified that when Terminiello spoke of the Zionistic Jews threatening to undermine our country people shouted, "Yes, send the Jews back to Russia," "Kill the Jews," "Dirty kikes;" that later, when the speaker referred to starving German mothers and the Morgenthau plan, persons close to him said, "They ought to starve the Jews" and "They ought to kill Morgenthau," and that, when the speech turned to non-Christian doctors and nurses

amputating German men and infecting German women, several women next to him cried, "They ought to do that to the Jews, they ought to cripple them." On the other hand, witnesses appearing for defendant testified that the audience was quiet, attentive and orderly at all times, and denied that anyone shouted threats against Jews.

The ordinance under which defendant was convicted provides, in pertinent part, "All persons who shall make, aid, countenance, or assist in making any improper noise, riot, disturbance, breach of the peace, or diversion tending to a breach of the peace, within the limits of the city * * * shall be deemed guilty of disorderly conduct, and upon conviction thereof, shall be severally fined not less than one dollar nor more than two hundred dollars for each offense." (City of Chicago, Revised Code of 1939, chap. 193, par. 1(1).) The gist of the charge against defendant was breach of the peace or, in the alternative, a diversion tending to a breach of the peace. Seeking a reversal of the judgment of conviction, defendant contends (1) that his address was delivered at a private meeting and is, therefore, legally insufficient to establish the offense of a breach of the public peace; (2) that his utterances did not create or tend to create a breach of the peace, and (3) that his speech was protected by the constitutional guarantee of freedom of speech. As to the conduct of the trial, exclusion of evidence or instructions to the jury, defendant makes no complaint.

It must be observed at the outset that the jury found the facts against defendant, the trial judge refused to set aside the verdict and the Appellate Court reviewed the evidence in detail and affirmed the judgment. Under these circumstances, this being a civil case, we are precluded from examining the record except to determine whether there is any evidence to support the verdict and whether the trial court and the Appellate Court properly applied the law to the facts. *Foreman-State Trust and Savings Bank*

v. *Demeter,* 347 Ill. 72; *Peters* v. *Chicago Railways Co.* 307 Ill. 202.

Our first inquiry is directed to whether defendant delivered his speech to a public or a private gathering and, indeed, whether the nature of the meeting has any bearing on the disposition of the issue. The general understanding is that a breach of the peace is a public offense, a violation of the public order, a disturbance of the public tranquility. (8 Am. Jur., Breach of Peace, secs. 3 and 6; 5 Words and Phrases, p. 763.) While the offensive acts, words or conduct must actually disturb or tend to disrupt the public peace and good order, we are not apprised of any authority to the effect that the public disorder must originate in acts committed in a public place. Certainly, the ordinance in question makes no such distinction. The essential element of the offense is a public disorder or a diversion tending to a public disturbance. A breach of the peace occurs whenever there is a violation of the public peace and order, and it is immaterial whether the violation originates in a private place or on public property. Cases dealing with the common-law offense of breach of the peace (*State* v. *Stenger,* 94 W. Va. 576; *Ware* v. *Loveridge,* 75 Mich. 488,) and cases involving statutes and ordinances specifically requiring that the disturbance occur in a public place (*Austin* v. *State,* 57 Tex. Crim. App. 623, 124 S.W. 636; *Terry* v. *State,* 22 Tex. App. 679, 3 S.W. 479,) are not pertinent here where we are dealing with an ordinance prescribing an appropriate penalty for "breach of the peace, or diversion tending to a breach of the peace, within the limits of the city."

In support of his assertion that acts constituting a breach of the peace must be committed in a public place, defendant places heavy reliance on five New York decisions: *People* v. *Monnier,* 280 N. Y. 77, (foul epithets spoken on telephone;) *People* v. *Perry,* 265 N. Y. 362, (fight among three men in a closed restaurant at four

o'clock in the morning;) *People* v. *Reid,* 40 N.Y.S. 2d 793, (distribution of religious literature and playing phonograph in hall of apartment house held private annoyance and not breach of the peace;) *People* v. *Ludovici,* 13 N.Y.S. 2d 88, (no disorder in house to house preaching;) *People* v. *Downer,* 6 N.Y.S. 2d 566, (no evidence of disorder in distribution of anti-Jewish pamphlets.) All the New York cases are distinguishable upon the ground that the words and conduct occurring in private places did not create or tend to create a public disturbance.

Furthermore, even if the acts charged as constituting a breach of the peace must be public in character, defendant's first contention still must fall. The jury, by its verdict, and the Appellate Court, in specific language, have both characterized the meeting at which defendant spoke as being public rather than private. The finding is fully supported by the evidence and will not be disturbed. The meeting was attended by eight hundred to one thousand persons. By enclosing several cards of admission with each invitation, those in charge of the meeting permitted each person on the mailing list to invite three or four others who, in turn, could each invite a friend. Thus, by delegation and subdelegation of the right to admission, the meeting was, to all intents and purposes, thrown open to the general public. Testimony to the effect that some persons were admitted without cards only fortifies the conclusion that the meeting was public.

Defendant next argues that his conduct and speech constituted neither a breach of the peace nor a diversion tending to a breach of the peace. The record discloses that Terminiello's conduct and words resulted in actual breaches of the peace both without and within the auditorium. Likewise, his actions amounted to a diversion tending to a breach of the peace. Defendant, self-described as a member of the "lunatic fringe," by his conduct in scheduling an address in a large auditorium, invited a

storm of protest, which was concentrated in the mob of approximately one thousand persons gathered in the public street outside the auditorium. Just as he drew his audience into the auditorium, he drew hundreds of his antagonists to the area adjacent to the hall. As related, the explosive situation thus created by defendant resulted in innumerable acts of violence extending over a period of several hours. The air was filled with shouts and noisy chanting, property was destroyed, rocks, brickbats and stench bombs were thrown at the auditorium, and both private individuals and police officers were assaulted. The meeting was, indeed, a diversion tending to a breach of the peace.

In addition, defendant opened his remarks by addressing the minority present as "scum" and asserting that "Nothing I could say tonight could begin to express the contempt I have for the slimy scum that got in by mistake." Alone, these epithets directed to certain members of the audience, constituted action tending to a breach of the peace. (*State* v. *O'Donnell,* 200 Atl. (N.J.) 739.) Plainly, they were derisive, fighting words likely to cause a breach of the peace by the addressee, words whose publication constitutes a breach of the peace by the speaker. (*Chaplinsky* v. *New Hampshire,* 315 U.S. 568.) As defendant continued with his opprobrious, abusive and insulting stories, one member of the audience arose and shouted, "You are a God damned liar," and was quickly ushered out by the police. Although there is some evidence to the effect that this disturbance occurred when Gerald L. K. Smith was speaking, Karel's testimony that the event took place when defendant was speaking is corroborated by Elizabeth Dilling, one of defendant's witnesses. Upon the record made, the jury was entitled to believe that defendant's utterances incited an actual breach of the peace within the auditorium. Further evidence of the feelings of the minority is Lucille Lipman's testimony

that she was very wrought up and felt like committing violence.

As to the majority of the audience, defendant, by his provocative and inflammatory utterances, instilled in them the fear of revolution, domination and murder by what he described as the criminal Jewish element in America and, more particularly, by the mob outside the auditorium. The evidence amply supports plaintiff's assertion that Terminiello aroused his audience to a feverish feeling of anger and hatred. Defendant asked his audience to take a Christian attitude and then worked them up to a point where there were shouts to kill, maim and starve the Jews and send them to Russia. In concluding his speech, he used such double talk as "They [the mob] are being led. There will be violence. That is why I say to you, men, don't do it. Walk out of here dignified. The police will protect you. We will not be tolerant of that mob out there. We are not going to be tolerant any longer. We are strong enough. We are not going to be tolerant of their smears any longer. We are going to stand up and dare them to smear us. We are not going to be tolerant any longer of their pagan eye-for-an-eye philosophy." In this manner was defendant guilty of a diversion tending to a breach of the peace by his wild, intemperate and inflammatory utterances. His speech tended to incite the majority of his audience to immediate violence against the angry mob outside. That his listeners did not engage in violence with the angry crowd is immaterial, (*Chaplinsky* v. *New Hampshire,* 315 U.S. 568; *People* v. *Most,* 171 N.Y. 423; *Delk* v. *Commonwealth,* 166 Ky. 39,) and not at all remarkable is that the mob was large, organized to a certain degree, and well interspersed with approximately seventy policemen. While utterances tending to create a breach of the peace more commonly involve words and epithets arousing the addressee to do violence to the speaker, we do not perceive any legitimate distinction in theory or

in effect upon the public peace and tranquility where the words charged tend to incite the addressees to disorder and violence against third persons.

Lastly, defendant complains that the judgment of conviction violates both the State and Federal constitutional guarantees of freedom of speech. In cases of which the present cause is typical, it is customary to inject the issue of freedom of speech so as to create the false impression that great constitutional questions are involved and sacred constitutional rights are jeopardized. In the case at bar, defendant was afforded a full and fair hearing before a judge and jury. The ordinance involved is a common one and does not violate constitutional rights. The sole question resolves itself into whether the conduct and utterances of defendant constituted a breach of the public peace or a diversion tending to a breach of the public order and tranquility. The evidence amply supports the verdict of the jury finding defendant guilty.

The right to freedom of speech is not without limitations. Freedom of speech is not license. The constitution does not absolve one from punishment for the unlawful nature and consequences of his speech. (*Chaplinsky* v. *New Hampshire,* 315 U.S. 568; *Stromberg* v. *California,* 283 U.S. 359; *People* v. *Doss,* 382 Ill. 307.) Defendant being guilty of an abuse of freedom of speech, his conviction and punishment do not constitute an abridgement of constitutional guaranties nor present a constitutional question for decision by this court. In *Chaplinsky·* v. *New Hampshire,* 315 U.S. 568, the Supreme Court of the United States said, "There are certain well-defined and narrowly limited classes of speech, the prevention and punishment of which have never been thought to raise any Constitutional problem. These include the lewd and obscene, the profane, the libelous, and the insulting or 'fighting' words—those which by their very utterance inflict injury or tend to incite an immediate breach of the peace."

Singularly applicable is the observation in *Cantwell* v. *Connecticut,* 310 U.S. 296, "The offense known as breach of the peace embraces a great variety of conduct destroying or menacing public order and tranquility. It includes not only violent acts but acts and words likely to produce violence in others. No one would have the hardihood to suggest that the principle of freedom of speech sanctions incitement to riot or that religious liberty connotes the privilege to exhort others to physical attack upon those belonging to another sect."

The judgment of the Appellate Court is affirmed.

*Judgment affirmed.*