THE VILLAGE OF SKOKIE, Plaintiff-Appellee, *v.* NATIONAL SOCIALIST PARTY OF AMERICA *et al.*, Defendants-Appellants.

First District (1st Division)   Nos. 77-628, 77-662 cons.

Opinion filed July 12, 1977.

PER CURIAM.

David Goldberger and Barbara O'Toole, both of Chicago, for appellants.

Harvey Schwartz and Gilbert Gordon, both of Skokie, for appellee.

PER CURIAM (Goldberg, P. J., McGloon and O'Connor, JJ.):

Plaintiff, village of Skokie, filed a complaint in the circuit court of Cook County on April 28, 1977, praying for the issuance of an injunction prohibiting defendants, the National Socialist Party of America and certain individual officers and members of the Party, from engaging in various activities in the village on May 1. After a hearing on the matter, the injunction was entered on April 29, and on the same day, this court denied defendants' motion for a stay of the injunction order. On April 30, at an *ex parte* proceeding, another judge of the circuit court amended the injunction to be effective from April 30 until further order of the court. On May 6, the judge who entered the original order of the court denied defendants' motions for either vacation of the April 30 order or a stay, and the court then adopted the April 30 order by modifying the April 29 order. Meanwhile, the Illinois Supreme Court had denied defendants' motion for a stay of the order and a direct appeal. On the afternoon of June 14, the United States Supreme Court granted *certiorari*, reversed the Illinois Supreme Court's denial of the stay, and remanded the matter for immediate appellate review or a stay. (*National Socialist Party of America v. Village of Skokie* (1977), ___ U.S. ___, 53 L. Ed. 2d 96, 97 S. Ct. 2205.) On June 22, the Illinois Supreme Court ordered this court to

either "commence immediately an expedited appellate review or, in the alternative, grant an appropriate stay of the injunction of the circuit court of Cook County." Upon receipt of this order on June 24, we acted immediately. All briefs were ordered filed by July 7, 13 days later, and oral arguments were heard on the morning of July 8. The issue in this appeal is generally, whether plaintiff met its burden of proof for the issuance of a prior restraint on defendants' first amendment rights, and specifically whether the swastika is protected speech under the circumstances of this case.

The injunction order is affirmed in part as modified, reversed in part, and the cause remanded with directions.

The complaint alleged the following pertinent facts. The village of Skokie contains a population of approximately 70,000 persons, of whom approximately 40,500 are of the Jewish religion, Jewish ancestry, or both. Included within the Jewish population are hundreds of persons who are survivors of Nazi concentration camps and many thousands whose families and close relatives were murdered by the Nazis. A large percentage of the Jewish population of Skokie is organized into groups and organizations. At the hearing, the above allegations were stipulated to by both parties. The complaint further alleged the nature of defendant Party's purpose, and stated that the "uniform of the National Socialist Party of America consists of the storm trooper uniform of the German Nazi Party embellished with the Nazi swastika." It is alleged that on March 20, the village police chief was informed by defendant Collin of defendants' intention to march on the village's sidewalks on May 1. As a result of publicity from the news media and early morning phone calls purportedly made by members of the defendant Party to Skokie residents whose names indicated the probability of their Jewish faith or ancestry (e.g., In re Greenfield, (1970), 66 Misc. 2d 733, 322 N.Y.S.2d 276), it was common knowledge in the village, particularly among the Jewish population, that the defendant Party intended to march in Skokie on May Day. The complaint further alleged:

" * * * The threatened march of the defendants on May 1st has aroused the passions of thousands of individuals of Jewish faith or ancestry within the Village and more particularly has aroused the passions of the survivors of the Nazi concentration camps who are taking measures unknown to the plaintiff to thwart the threatened march.

10. The march of the defendants on May 1, 1977 is a deliberate and wilful attempt to exacerbate the sensitivities of the Jewish population in Skokie and to incite racial and religious hatred. Such march, if not restrained by Order of this Court, constitutes a grave

and serious threat to the peace of the citizens of the Village of Skokie.

11. By reason of the ethnic and religious composition of the Village of Skokie and the circumstances alleged above, the public display of the swastika in connection with the proposed activities of the defendant, National Socialist Party of America, constitutes a symbolic assault against large numbers of the residents of the Plaintiff village and an incitation to violence and retaliation."

The complaint prayed for the issuance of an injunction enjoining defendants from various activities in the village of Skokie on May 1.

Defendants filed a motion to dismiss stating that the complaint fails to state a cause of action upon which relief can be granted; seeks relief barred by the first and fourteenth amendments to the United States Constitution and alleges facts which are untrue. The motion to dismiss referred to an affidavit of one of the individual defendants appended thereto.

The affidavit stated that the affiant has been a leader of the defendant Party for seven years and has propounded the Party's platform by peaceable public assemblies, parades and speechmaking in the Chicago area. About March 20, 1977, the affiant wrote to Skokie officials stating his intention to hold a peaceable public assembly of the defendant Party and its supporters in Skokie on May 1. The purpose of the assembly was to protest a Skokie Park District requirement for the posting of a $350,000 policy of insurance prior to the use of Skokie parks. The letter also stated that the assembly would take place in early afternoon without obstruction of traffic and that demonstrators would obey all laws and would march on the sidewalk in single file.

The affidavit also stated that the assembly would consist of 30 to 50 demonstrators who would conduct a picket line, marching in single file in front of the Skokie Village Hall and that demonstrators would wear their uniforms including a swastika armband. Demonstrators would carry placards and banners containing slogans such as "Free Speech For The White Man." The affiant had no plans to distribute handbills at this assembly.

The affidavit also stated that affiant and members of the Nazi Party would not make derogatory public statements directed to any ethnic or religious group, they all intend to cooperate with reasonable police instructions and that affiant knows of no member of the defendant Party who has made telephone calls to or conducted a telephone campaign to persons of Jewish faith. At the hearing, the affidavit was admitted into evidence by stipulation of the parties.

The circuit court of Cook County conducted a hearing on a motion

by plaintiff for a preliminary injunction. (Ill. Rev. Stat. 1975, ch. 69, par. 3.) The court considered the abovementioned affidavit and the testimony of a number of witnesses. A resident of Skokie, an officer in several Jewish organizations, testified that he learned of the planned demonstration from the newspapers. As a result, meetings of some 15 to 18 Jewish organizations, within Skokie and surrounding areas, were called, and a counterdemonstration was scheduled for the same day as the demonstration planned by defendants. The witness estimated that some 12,000 to 15,000 people were expected to participate. In the opinion of the witness, this counterdemonstration would be peaceful if defendants did not appear. However, if they did appear, the outrage of the participants might not be controllable. The witness testified that other counterdemonstrations were planned by other groups.

Skokie introduced other opinion evidence that bloodshed would occur if the defendants demonstrated as planned. The mayor of the village of Skokie testified regarding his opinion, formed after discussion with leaders of community and religious groups, that if the march or demonstration by defendants took place, an uncontrollably violent situation would develop.

Plaintiff also called as a witness a Jewish resident who was a survivor of Nazi concentration camps. He testified as to the effect the swastika has on him and other survivors. According to his testimony, the swastika is a symbol that his closest family was killed by the Nazis, and that the lives of him and his children are not presently safe. He further stated that he does not presently intend to use violence against defendants should they appear in Skokie, but that when he sees the swastika, he does not know if he can control himself. He further testified that between 5000 and 7000 survivors of the Nazi holocaust reside in the village of Skokie.

Defendants' case consisted of the testimony of defendant Frank Collin, the leader of the defendant Party, and his affidavit previously described as having been admitted into evidence. He testified, *inter alia,* that the purpose of the demonstration was to peacefully protest the Skokie Park District's ordinance which required a bond of $350,000 to be posted prior to the issuance of a park permit. If enjoined from marching on May 1, he planned a demonstration on May 22, three weeks hence, or on a future date yet undecided.

After hearing arguments of counsel, the trial court entered an order enjoining defendants

"from engaging in any of the following acts on May 1, 1977, within the Village of Skokie: Marching, walking or parading in the uniform of the National Socialist Party of America; Marching, walking or parading or otherwise displaying the swastika on or off their person; Distributing pamphlets or displaying any materials

which incite or promote hatred against persons of Jewish faith or ancestry or hatred against persons of any faith or ancestry, race or religion."

As abovementioned, defendants immediately filed their notice of appeal in the trial court and a motion for a stay in this court. The motion was denied.

At about noon on Saturday, April 30, the village presented a sworn petition to another judge of the circuit court, which alleged that defendants, having been enjoined from demonstrating on Sunday, May 1, were planning on demonstrating that very day, April 30. It was further alleged that news of the Saturday demonstration was particularly disseminated among the Jewish citizens of Skokie, and that the circumstances in the village would be the same on Saturday as on Sunday, except that the village government is less able on the shortened notice to muster the forces needed to curb the impending violence. The petition prayed that the injunction order of April 29 be amended to enjoin defendants from engaging in the activities proscribed therein "without limitation as to date or time, and pending further order of the court." The judge modified the order so as to enjoin defendants from the activities discussed in the April 29 order "within the Village of Skokie on April 30, 1977 or at any time thereafter pending further order of this Court." On May 6, defendants' motion to vacate the order of April 30 was denied after a brief hearing during which counsel for both parties stipulated that on April 30, counsel for plaintiff attempted unsuccessfully to notify defense counsel in advance of the petition to amend the injunction. After a discussion as to the nature of defendants' conduct, the judge amended his first order to read the same as the April 30 order. Defendants appeal from both orders, and the matters have been consolidated for disposition.

■■ Before beginning a discussion of the case, we wish to note that some very grave procedural problems are lurking in the record, but that they are deemed waived by the defendants' failure to preserve them. While we do not sanction the grossly improper legal procedures adopted by both parties to this lawsuit, we shall consider the merits of the case as discussed in defendants-appellants' brief. For simplicity, the orders of April 29 as modified, and April 30, appealed to this court will be considered in the singular.

Defendants' primary argument on appeal is that the trial court erred in entering the injunction order because the plaintiff village failed to sustain its burden of proof. The applicable law is that a prior restraint upon first amendment rights bears a heavy presumption against its constitutional validity. (*Carroll v. President of Princess Anne* (1968), 393 U.S. 175, 325, 89 S. Ct 347; *Organization for a Better Austin v. Keefe* (1971), 402 U.S.

415, 29 L. Ed. 2d 1, 91 S. Ct. 1575.) The question before the court is whether plaintiff, village of Skokie, has met its heavy burden of showing justification for the imposition of the circuit court's prior restraint upon defendants' rights to freedom of speech and public assembly.

Our first determination must be the scope of the injunction order, which is somewhat puzzling. For ease in discussion, Part A of the order enjoins defendants from marching, walking, or parading in the uniform of the National Socialist Party of America. Part B enjoins them from marching, walking, parading, or otherwise displaying the swastika on or off their persons. Part C enjoins defendants from distributing pamphlets or displaying any materials which incite or promote hatred against persons of Jewish faith or ancestry, or hatred against persons of any faith or ancestry, race or religion.

As we read Part A in the context of the record on appeal, it is manifestly unclear as to which acts of defendants are prohibited. The clear language leads us to believe that defendants were not enjoined from demonstrating in Skokie while dressed in civilian clothes, but only in the uniform of the National Socialist Party of America. Yet, the nature of the matter on appeal is that the parties have considered the injunction as enjoining any demonstrations by defendants, whether in uniform or in mufti. In the rush to judgment in this hastily briefed case, the issue has escaped notice. Rather than requesting further briefs and argument on the point, we shall consider Part A as consisting of two portions. First, whether any demonstration in Skokie by the defendants is enjoined, and second, whether the wearing of the uniform of the National Socialist Party of America is enjoined at any such demonstration.

As thusly framed, the first issue is whether plaintiff has overcome the presumptive invalidity of the prior restraint on defendants' planned demonstration to be held in front of the Skokie Village Hall if defendants would not wear their uniforms. The evidence presented to the trial court showed that defendants would not obstruct traffic, would obey all laws, would march in single file on the sidewalk and would carry placards and banners containing slogans such as "Free Speech For The White Man," "White Free Speech," and "Free Speech For White America." Defendants planned to distribute no written material, and would not make any derogatory public statements, written or oral, directed at any ethnic or religious group. In short, the evidence pertaining to the defendants' conduct showed nothing other than a peaceful assembly of 30-50 persons demonstrating for 20-30 minutes against what they believed was an unfair Park District Ordinance requiring the posting of high bond prior to the issuance of a park permit for demonstrations. Looking only at defendants' expected conduct, no conclusion may be drawn from the record other than a planned exercise of "basic constitutional rights in their most

pristine and classic form." (*Edwards v. South Carolina* (1963), 372 U.S. 229, 235, 9 L. Ed. 2d 697, 702, 83 S. Ct. 680.) Yet, the other evidence presented to the trial court showed that if the defendants ever appear in Skokie to demonstrate, there was and is a virtual certainty that thousands of irate Jewish citizens would physically attack the defendants. The trial court entered the order enjoining the demonstration, stating that he thought defendants "intended to incite riot, to cause bodily harm, and to do all those things that the Constitution does not give a defendant a right to do."

■■ The law of our nation is clear as to the question of whether the presence of hostile spectators or bystanders may justify the restraint of otherwise legal first amendment activities. "As to the possibility of there being hostile audience members causing violence, the law is quite clear that such considerations are impermissible * * *." (*Collin v. Chicago Park District* (7th Cir. 1972), 460 F.2d 746, 754.) Starting with *Terminiello v. City of Chicago* (1948), 337 U.S. 1, 93 L. Ed. 1131, 69 S. Ct. 894, and continuing through *Gregory v. City of Chicago* (1969), 394 U.S. 111, 22 L. Ed. 2d 134, 89 S. Ct. 946, the rule has been that if the communications expressed do not fit into an exception stripping them of first amendment protections, then under our Constitution, the public expression of ideas may not be prohibited merely because the ideas themselves are offensive to the hearers. "The threat of a hostile audience cannot be considered in determining whether a permit shall be granted or in ruling on a request for an injunction against a demonstration. * * * Thus, our laws bespeak what should be; for were it otherwise, enjoyment of constitutional rights by the peaceable and law-abiding would depend on the dictates of those willing to resort to violence." (*Dr. Martin Luther King, Jr. Movement, Inc. v. City of Chicago* (N.D. Ill. 1976), 419 F. Supp. 667, 675; see *Rockwell v. Morris* (1961), 12 App. Div. 2d 272, 211 N.Y.S.2d 25.) Since the plaintiff has failed to meet its burden of proof, in so far as the injunction order purports to enjoin defendants from marching, walking or parading in the village of Skokie without reference to the uniform of the National Socialist Party of America, it is reversed.

■■ The second issue, therefore, is whether plaintiff has overcome the presumptive invalidity of the prior restraint on defendants' demonstrating while wearing the uniform of the National Socialist Party of America in the village of Skokie. The complaint states, *inter alia:*

"The members of the National Socialist Party of America have patterned their conduct, their uniform, their slogan and their tactics along the pattern of the German Nazi Party, including the adoption of the hated swastika. The uniform of the National Socialist Party of America consists of the storm trooper uniform of the German Nazi Party embellished with the Nazi swastika."

As we view both the plaintiff's definition and the evidence, the uniform of the defendant Party consists of two separate and distinct elements, the storm trooper uniform and the swastika. Each element shall be considered separately, for it is in the interest of law and justice that an injunction should not be broader than is necessary. The wearing of the swastika will be discussed in conjunction with Part B of the injunction order.

The testimony disclosed that the storm trooper uniform of the German Nazi Party consists of a brown shirt and is worn with a swastika. Although the evidence does not further describe the uniform, we may take judicial notice that the storm trooper uniform consists of a long-sleeved brown shirt, black necktie, dark trousers, high leather boots, and is worn with an armband displaying the swastika. In the context of this case, Webster's Third New International Dictionary defines "storm trooper" as "a member of a politico-military body similar in aims or function to the Sturmabteilung [of Nazi Germany]." The defendants' wearing of such a uniform is admittedly an expression that their goals are similar to those of the German Nazi Party. The thorny issue arising is whether the wearing of the storm trooper uniform *sans* swastika is protected speech under the first amendment. If so, it may not generally be prohibited.

■■■ The wearing of distinctive clothing to express a thought or idea is generally the type of a symbolic act which is considered protected speech within the first amendment. For example, a black armband worn by schoolchildren to protest the Vietnam War was held protected speech in *Tinker v. Des Moines Independent Community School District* (1969), 393 U.S. 503, 21 L. Ed. 2d 731, 89 S. Ct. 733. Similarly, a jacket bearing the words "Fuck the Draft" was held protected speech in *Cohen v. California* (1971), 403 U.S. 15, 29 L. Ed. 2d 284, 91 S. Ct. 1780. In both cases, as in *Schacht v. United States* (1970), 398 U.S. 58, 26 L. Ed. 2d 44, 90 S. Ct. 1555, and other cases, in the absence of other circumstances the wearing of distinctive clothing was considered only the communication of ideas and therefore protected speech. There are, of course, circumstances which could remove speech from the sphere of protection. The advocacy of abstract force or violence is generally protected speech "except where such advocacy is directed to inciting or producing imminent lawless action and is likely to incite or produce such action." (*Brandenburg v. Ohio* (1969), 395 U.S. 444, 447, 23 L. Ed. 2d 430, 89 S. Ct. 1827.) In *Brandenburg,* a Ku Klux Klan meeting of individuals wearing the distinctive hood and uttering statements quite derogatory of Blacks and Jews was held protected speech. In the instant case, plaintiff argues that the Nazi uniform is the symbolic equivalent of a public call to kill all Jews and is a direct incitation to immediate mass murder, which is not entitled to first amendment protection. The record does not support this

conclusion. There is not one bit of evidence in the record that the uniform without the swastika would have such an effect. There has been no showing that there are persons who would be directly and immediately incited to commit mass murder as a result of seeing defendants' storm trooper uniforms.

■■ Other exceptions we need not concern ourselves with are the obscenity and libel exceptions. We do, however, need to carefully consider the exception of fighting words. According to the rule in *Chaplinsky v. New Hampshire* (1942), 315 U.S. 568, 86 L. Ed. 1031, 62 S. Ct. 766:

> " * * * it is well understood that the right of free speech is not absolute at all times and under all circumstances. There are certain well-defined and narrowly limited classes of speech, the prevention and punishment of which have never been thought to raise any Constitutional problem. These include the lewd and obscene, the profane, the libelous, and the insulting or 'fighting' words—those which by their very utterance inflict injury or tend to incite an immediate breach of the peace. It has been well observed that such utterances are no essential part of any exposition of ideas, and are of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality." (315 U.S. 568, 571-72. 86 L. Ed. 1031, 1035, 62 S. Ct. 766.)

Such "fighting" words are those personally abusive epithets which, when addressed to an ordinary citizen, as a matter of common knowledge, are inherently likely to provoke violent reaction. (*Cohen v. California* (1971), 403 U.S. 15, 20, 29 L. Ed. 2d 284, 291, 91 S. Ct. 26.) The evidence of record does not support a conclusion that the uniform *sans* swastika constitutes fighting words. There is no testimony that anyone in the village of Skokie would consider the uniform itself as an abusive epithet which would provoke him to violent reaction. Nor can this court say as a matter of law and common knowledge that the brown-shirt uniform stripped of all other symbols is inherently likely to provoke violent reaction. Rather, the wearing of such a uniform must be considered, in the context of the instant case, as symbolic speech protected by the first amendment. Above all, "the First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." (*Police Department v. Mosley* (1972), 408 U.S. 92, 95, 33 L. Ed. 2d 212, 216, 92 S. Ct. 2286.) Any shock effect caused by such a uniform must be attributed to the content of the ideas expressed or to the onlookers' dislike of demonstrations by defendants. "But '[i]t is firmly settled that under our Constitution the public expression of ideas may not be prohibited merely because the ideas are themselves offensive to some

of their hearers,' [citations] or simply because bystanders object to peaceful and orderly demonstrations." (*Bachellar v. Maryland* (1970), 397 U.S. 564, 567, 25 L. Ed. 2d 570, 574, 90 S. Ct. 1312.) Since plaintiff has failed to meet its burden of proof, that portion of the injunction order which purports to enjoin defendants from wearing the uniform of the National Socialist Party of America without other symbols such as the swastika, while marching, walking or parading in the village of Skokie is reversed as being an unconstitutional prior restraint of defendants' first amendment rights.

■■  The third issue on appeal is whether the plaintiff has overcome the presumptive invalidity of the prior restraint on defendants' "marching, walking or parading or otherwise displaying the swastika on or off their person," which is Part B of the injunction order. Since the display of the swastika is an expression of defendants' ideas, however odious and repulsive to most members of our society, it will generally be considered protected speech unless it falls within the exceptions discussed in connection with the wearing of the uniform. There is no showing that the display or wearing of the swastika will incite anyone to immediately commit mass murder in furtherance of the aims of the German Nazi Party, or to commit any unlawful act in furtherance of the goals of the defendant Party. *Brandenburg v. Ohio* (1969), 395 U.S. 444, 23 L. Ed. 2d 430, 89 S. Ct. 1827.

The original complaint filed in this cause alleges that by reason of the ethnic and religious composition of the village and the particular circumstances of this case, the public display of the swastika by defendants will incite large numbers of Skokie residents to violence and retaliation. We understand this portion of the complaint, although inartfully drafted in haste, to allege under the circumstances of this case that the display of the swastika constitutes fighting words and is therefore not protected by the first amendment. The evidence taken at the hearing which relates to this allegation is illuminating.

One Skokie resident who was a survivor of German concentration camps testified that to him, the swastika is a symbol that his closest family was killed by the Nazis and that he presently fears his death and the death of his children at the hands of those displaying the swastika. He feels strongly about the defendants and their swastika and does not know if he can control himself should he see a swastika in the village where he lives. By implication, a great many of the other 5000 to 7000 survivors of the holocaust who reside in Skokie may not be able to control themselves under similar circumstances. The mayor of the plaintiff village (who testified that he is a Roman Catholic) stated at the hearing that there was a "terrible feeling of unrest regarding the parading of the swastika in the village of Skokie, a terrible feeling expressed by people in words that they

should not have to tolerate this type of demonstration, in view of their history as a people." The legal question, therefore, is whether the display of the swastika in the village of Skokie, under the circumstances of this case; would constitute "fighting words."

Since *Chaplinsky v. New Hampshire* (1942), 315 U.S. 568, 86 L. Ed. 1031, 62 S. Ct. 766, the fighting words exception has been well established in our law and is a viable rule, but it has been noted that *Chaplinsky*

> "has been signficantly limited by cases which hold protected the peaceful expression of views which stirs people to anger because of the content of the expression, or perhaps of the manner in which it is conveyed, and that breach of the peace and disorderly conduct statutes may not be used to curb such expression." (The Constitution of the United States of America—Analysis and Interpretation, Senate Document No. 92-82, at 1008.)

In *Terminiello v. Chicago* (1949), 337 U.S. 1, 93 L. Ed. 1131, 69 S. Ct. 894, the speaker-defendant exhorted his listeners with vitriolic anti-Semitic and pro-Fascist statements. The crowd gathered outside to protest became angry and turbulent as a result of the defendant's speech. This court affirmed defendant's conviction under a city of Chicago disorderly conduct statute. (*City of Chicago v. Terminiello* (1947), 332 Ill. App. 17.) At issue was whether defendant's statements constituted "fighting words." The Illinois Supreme Court affirmed (400 Ill. 23), but the United States Supreme Court decided the case on other grounds:

> "The argument here has been focused on the issue of whether the content of petitioner's speech was composed of derisive, fighting words, which carried it outside the scope of the constitutional guarantees. See *Chaplinsky v. New Hampshire,* 315 U.S. 568; *Cantwell v. Connecticut,* 310 U.S. 296, 310. We do not reach that question, for there is a preliminary question that is dispositive of the case." (337 U.S. 1, 3, 93 L. Ed. 1131, 1134, 69 S. Ct. 894.)

It has been somewhat unclear ever since whether anti-Semitic or other similar derogatory statements may be considered as fighting words when intentionally delivered to and heard by the reviled party. There is a recent clue, however, in the opinion of the court in *Cohen v. California* (1971), 403 U.S. 15, 20, 29 L. Ed. 2d 284, 291, 91 S. Ct. 1780:

> "No individual actually or likely to be present could reasonably have regarded the words on appellant's jacket as a direct personal insult. Nor do we have here an instance of the exercise of the State's police power to prevent a speaker from intentionally provoking a given group to hostile reaction. *Cf. Feiner v. New York,* 340 U.S. 315 (1951); *Terminiello v. Chicago,* 337 U.S. 1 (1949). There is, as noted above, no showing that anyone who saw

Cohen was in fact violently aroused or that appellant intended such a result."

As stated earlier, *Cohen v. California* concisely stated the *Chaplinsky* fighting words test as follows:

"[T]hose personally abusive epithets which, when addressed to the ordinary citizen, are, as a matter of common knowledge, inherently likely to provoke violent reaction." (403 U.S. 15, 20, 29 L. Ed. 2d. 284, 291, 91 S. Ct. 1780.)

As in *Cohen,* we shall determine whether the test has been subjectively and objectively satisfied.

The evidence conclusively shows that at least one resident of Skokie considered the swastika to be a personally abusive epithet which was, in light of his personal history, inherently likely to provoke a violent reaction in him if the swastika were intentionally displayed by defendants in the village of Skokie. Other evidence shows by implication that similar or identical feelings were shared by thousands of other residents of the village of Skokie. In *Cohen v. California,* it is stated: "We have been shown no evidence that substantial numbers of citizens are standing ready to strike out physically at whoever may assault their sensibilities with execrations like that uttered by Cohen." (403 U.S. 15, 23, 29 L. Ed. 2d 284, 292, 91 S. Ct. 1780.) In the instant case, the evidence shows precisely that substantial numbers of citizens are standing ready to strike out physically at whoever may assault their sensibilities with the display of the swastika. We feel that the subjective portion of the fighting words test has been satisfied.

■■ The objective portion of the fighting words test follows. Would the ordinary citizen be provoked to violent reaction? We cannot say more than the evidence shows that the average Jewish resident of the village of Skokie would be provoked. Yet, in *Cantwell v. Connecticut* (1940), 310 U.S. 296, 309, 84 L. Ed. 1213, 1220, 60 S. Ct. 900, Cantwell played a phonograph record for two Roman Catholic men in a Roman Catholic neighborhood, and the record singled out "the Roman Catholic Church for strictures couched in terms which naturally would offend not only persons of that persuasion, but all others who respect the honestly held religious faith of their fellows." The hearers were offended, but they had already consented to listen to the record. If the swastika would naturally offend thousands of Jewish persons in Skokie, then it must be said that it would offend all those who respect the honestly held faith of their fellows, including the ordinary citizen.

The remaining portion of the objective test is whether the swastika, as a matter of common knowledge, is inherently likely to provoke violent reactions among those of the Jewish persuasion or ancestry if brought in close proximity to their homes or places of worship. As stated in dissent to

an unrelated issue in *Anderson v. Vaughn* (D. Conn. 1971), 327 F. Supp. 101, 106:

> "By way of illustration, if one were to parade a Ku Klux Klan flag or other such emblem into an NAACP meeting it would quite likely provoke a riotous reaction; or to publicly carry a Nazi flag into a synagogue would certainly be calculated to incit disorder; or to display a Viet Cong flag at a political gathering of loyal Americans might well be calculated to provoke an incitement to violence. Contrary conclusions would be both unreal and naive."

Mr. Justice Black's dissent in *Tinker* leaves us with similar teachings:

> "The truth is that a teacher of kindergarten, grammar school, or high school pupils no more carries into a school with him a complete right to freedom of speech and expression that an anti-Catholic or anti-Semite carries with him a complete freedom of speech and religion into a Catholic church or Jewish synagogue." (393 U.S. 503, 521-22, 21 L. Ed. 2d 731, 746, 89 S. Ct. 733.)

In *Jewish War Veterans of the United States v. American Nazi Party* (N.D. Ill. 1966), 260 F. Supp. 452, a group similar to defendants herein were enjoined from marching around Jewish synagogues during the Jewish High Holy Days.

The swastika is a symbol which, as demonstrated by the record in this case and as a matter of common knowledge, is inherently likely to provoke violent reaction among those of the Jewish persuasion or ancestry when intentionally brought in close proximity to their homes and places of worship. The swastika is a personal affront to every member of the Jewish faith, in remembering the nearly consummated genocide of their people committed within memory by those who used the swastika as their symbol. This is especially true for the thousands of Skokie residents who personally survived the holocaust of the Third Reich. They remember all too well the brutal destruction of their families and communities by those then wearing the swastika. So too, the tens of thousands of Skokie's Jewish residents must feel gross revulsion for the swastika and would immediately respond to the personally abusive epithets slung their way in the form of the defendants' chosen symbol, the swastika. The epithets of racial and religious hatred are not protected speech (*Beauharnais v. Illinois* (1952), 343 U.S. 250, 96 L. Ed. 919, 72 S. Ct. 725), and we find that the village of Skokie has met its heavy burden of justifying the prior restraint imposed upon the defendants' planned wearing and display of the swastika. So that there should be no confusion, Part B of the injunction order, dealing with the swastika, is modified to read: "Intentionally displaying the swastika on or off their persons, in the course of a demonstration, march, or parade within the Village of Skokie." As thus modified, the order is affirmed.

We wish to comment that according to our understanding of the case, the demonstration planned by defendants would not be punctuated by derogatory public statements directed at any ethnic or religious group. We cannot say what our ruling would have been if the facts showed the type of demonstration discussed in the well-reasoned opinion in *Rockwell v. Morris* (1961), 12 App. Div. 2d 272, 211 N.Y.S. 2d 25, *aff'd mem.*, 10 N.Y. 2d 721, 749, 219 N.Y.S. 2d 268, 605, *cert. denied*, 368 U.S. 913, 7 L. Ed. 2d 131, 82 S. Ct. 194, which is distinguishable on its facts. Therein, the demonstration was to be held in a public park in New York City, not in the heart of a relatively small suburb of which persons of the Jewish faith constitute the majority.

We wish also to comment that whether or not the views of the defendant Party coincide with those of the German Nazi Party is absolutely irrelevant to our decision. The intentional thrusting of the swastika as portrayed in this case is that which is enjoined, not defendants' beliefs.

■■ The fourth issue is whether plaintiff has overcome the presumptive invalidity of the prior restraint imposed in Part C of the injunction order, which enjoins defendants from "distributing pamphlets or displaying any materials which incite or promote hatred against persons of Jewish faith or ancestry or hatred against persons of any faith or ancestry, race or religion." The evidence does not show that defendants intend to engage in any such communications. In fact, the evidence discloses the contrary, that such messages would not be included within the scope of the intended demonstration. Without considering the constitutional aspects of this issue, we find that plaintiff has not shown a need for Part C. Accordingly, Part C of the order is reversed.

■■ The last issue is whether the injunction as modified is overbroad insofar as it prohibits certain activities until further order of court in the entire village of Skokie. We believe that the evidence shows that the proximity of defendants' intended display of the swastika to its intended viewers is crucial. Of course, a remote display could not properly be enjoined. The injunction order limiting its proscriptions to within the boundaries of the village of Skokie is, in our opinion, not too broad, and is sufficient to protect against the unprotected speech involved.

In conclusion, we wish to comment on the procedural stance of this case. Supreme Court Rule 307(c) provides that a preliminary injunction may be appealed to this court, and that a decision may be had within a short time. In such a case, the briefing schedule set by rule, unless this court orders a different schedule, is that the appellant's brief shall be filed within seven days of the filing of the record on appeal, the appellee's brief seven days later, and the appellant's reply brief seven days after that. (Ill.

Rev. Stat. 1975, ch. 110A, par. 307(c).) In all, such a case should be fully briefed and ready for argument within 21 days of the filing of the record on appeal with this court. Instead of utilizing the benefits of this rule, appellants herein delayed the disposition of the merits of the case by appealing the denial of various stay orders. Had the provisions of Supreme Court Rule 307(c) been utilized, the record on appeal having been filed on May 13, the case could have been fully briefed by June 3, instead of July 7. We would caution litigants in similar situations to comply with the Rules of the Supreme Court of Illinois.

In closing, we are constrained to add that none of what we have said prevents the prosecution of defendants should they incite violence. Also, this opinion does not prevent plaintiff village from enforcing its various ordinances pertaining to demonstrations and parades. We make no decision as to the validity of the village's ordinances in this regard.

We consider that under the law of Illinois the preliminary injunction that is the subject of this interlocutory appeal is merely provisional as distinguished from permanent. (*Cf. Bohn Aluminum & Brass Co. v. Barker* (1973), 55 Ill. 2d 177, 179-80, 303 N.E.2d 1.) It is simply a device for maintaining the *status quo* "until the cause can be disposed of on its merits." (*Schuler v. Wolf* (1939), 372 Ill. 386, 389, 24 N.E.2d 162. See also *D. Nelsen & Sons, Inc. v. General American Development Corp.* (1972), 6 Ill. App. 3d 6, 9, 284 N.E.2d 478.) We therefore direct the trial court to proceed to immediate trial on the merits.

The order of the circuit court is affirmed in part as modified, reversed in part and remanded with directions. The order is modified to read as follows:

"[Defendants] be and hereby are enjoined and restrained from engaging in any of the following actions within the village of Skokie until further order of the court: Intentionally displaying the swastika on or off their persons, in the course of a demonstration, march, or parade."

Affirmed in part as modified, reversed in part and remanded with directions.