**Frank COLLIN et al., Plaintiffs,**

v.

**Albert SMITH et al., Defendants.**

**No. 77 C 2982.**

United States District Court, N. D. Illinois, E. D.

Feb. 23, 1978.

David A. Goldberger, American Civil Liberties Union, Chicago, Ill. for plaintiffs.

Harvey Schwartz, Schwartz & Zaban, Chicago, Ill., for defendants.

## MEMORANDUM OPINION AND ORDER

DECKER, District Judge.

Plaintiffs, the National Socialist Party of America and its leader, Frank Collin, bring this action challenging three ordinances of the Village of Skokie, Illinois, on the grounds that the ordinances deprive them of their rights to freedom of speech and assembly in violation of the First and Fourteenth Amendments to the United States Constitution. Defendants are the Village itself and its President, Village Manager and Corporation Counsel. On October 21, 1977, the court denied plaintiffs' motion for a preliminary injunction but ordered the cause set for trial on an expedited schedule in view of the compelling national interest in prompt resolution of cases implicating First Amendment freedoms. The case was tried to the bench on December 2, 1977, and has now been submitted for judgment on the trial record and additional documentary evidence admitted by stipulation of the parties. This Memorandum Opinion constitutes the court's findings of fact and conclusions of law for purposes of F.R.Civ.P. 52(a).

### I. *Factual Background*

Skokie is a municipal corporation north of Chicago, which is generally regarded in the Chicago area as a predominantly Jewish community. In fact, as of 1974, it had 40,500 Jewish residents out of a total population of approximately 70,000. Under the Illinois Constitution, Skokie is a home rule unit and as such has plenary legislative authority to enact ordinances for the protection of the public welfare within its borders. Ill.Const. Art. VII, § 6(a).

Plaintiff Collin testified that the National Socialist Party is "a Nazi organization", and that in public appearances its members wear uniforms reminiscent of those worn by members of the German Nazi Party during the rule of the Third Reich. Specifically, plaintiffs employ the swastika as a party symbol. Among their more controversial political views, plaintiffs believe that black persons are "biologically inferior" to whites and should be "repatriated" to Africa, and that American Jews have excessive influence in government and close ties to international Communism. Collin stated that this Jewish influence should be "exposed and documented and presented to the American public", but denied that plaintiffs endorse the Third Reich's "final solution" to the problem of Jewish influence—genocide.

In late 1976, plaintiffs planned a series of demonstrations in Jewish communities, including Skokie. According to plaintiffs' publications, this campaign was based on the belief that Jews are responsible for busing and racial integration in the Chicago school system, which plaintiffs have been protesting in other parts of the Chicago area. Plaintiffs were denied permission to demonstrate in a Skokie park because of a Skokie Park District ordinance which required them to obtain $350,000 in liability and property damage insurance.

Plaintiffs then planned a demonstration in the Village to protest the Park District ordinance. The demonstration was set for May 1, 1977. On March 20, Collin notified Skokie Police Chief Kenneth Chamberlain of plaintiffs' plans and assured him that the demonstration would be brief, peaceful and orderly. News of the planned demonstration caused considerable consternation in Skokie. The situation was exacerbated by the appearance of some of plaintiffs' handbills within the Village and by a rash of offensive and threatening telephone calls to Skokie residents with Jewish surnames. Although there is no evidence that plaintiffs were responsible for these calls,[1] they undoubtedly stirred public sentiment against the proposed demonstration. As a result of this sentiment, the Village decided to attempt to prevent the demonstration. It obtained a preliminary injunction against the demonstration in state court, which has since been vacated, and on May 2, 1977, enacted the three ordinances at issue in this action.

Ordinance # 994 is a comprehensive permit system for all parades or public assemblies of more than 50 persons anywhere within Skokie. It requires all permit applicants to obtain $300,000 in liability insurance and $50,000 in property damage insurance. Ordinances # 995 and # 996 are both criminal measures: # 995 prohibits the dissemination of material which incites racial or religious hatred, with intent to incite such hatred; # 996 prohibits public demonstrations by members of political parties while wearing military-style uniforms. These ordinances are also enforced through the permit mechanism of # 994. A specific provision of that ordinance, § 27–56(c), requires that a permit be denied to public assemblies which will engage in the activity prohibited by # 995 [2] and a catch-all provision relating to assemblies organized for unlawful purposes, § 27–56(i), serves the same function for # 996.

On June 22, 1977, Collin applied for a permit under # 994. The application recited that the proposed public assembly would take place on July 4, would consist of 30 to 50 people demonstrating in front of the Village Hall, would last about a half hour, and would not disrupt traffic. It stated further that the participants would wear uniforms including swastikas and carry placards carrying statements such as "White Free Speech", "Free Speech for the White Man", and "Free Speech for White Americans", but would not distribute handbills or literature. The evidence shows that the location selected for the parade was in a commercial, rather than residential area of Skokie. Finally, the application stated that plaintiffs could not obtain the required insurance, and requested that the Village either waive the requirement or assist plaintiffs in finding an insurer. The application was denied by defendant John Matzer, the Village Manager, on the grounds that plaintiffs planned to wear military-style uniforms in violation of # 996. Plaintiffs responded by bringing this action.

## II. *Preliminary Issues*

As in all actions to invalidate state laws on constitutional grounds, the court must begin by considering the various doctrines which limit the intrusion of the federal courts into the operation of state government. All three ordinances impose criminal penalties for their violation. *Dombrowski v. Pfister*, 380 U.S. 479, 85 S.Ct. 1116, 14 L.Ed.2d 22 (1965), held that the federal district courts have jurisdiction over actions for declaratory and injunctive relief against state criminal statutes on the grounds that they violate the First Amendment through vagueness and overbreadth.[3] Although *Dombrowski* has been restricted as to injunctive relief by *Younger v. Harris*,

1. Defendants did not suggest that plaintiffs were responsible for the calls, and the reporting officer on one of the police reports admitted into evidence expressed the opinion that it was doubtful that plaintiffs were responsible.

2. This is an oversimplification of § 27–56(c), which is discussed in detail in Part IV(F) of this opinion.

3. Jurisdiction is based on the Civil Rights Act, 42 U.S.C. § 1983 and 28 U.S.C. § 1343(3).

401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971), *Steffel v. Thompson*, 415 U.S. 452, 94 S.Ct. 1209, 39 L.Ed.2d 505 (1974), held that declaratory relief may still be granted when there is an imminent threat of prosecution if the plaintiffs exercise their First Amendment rights. Plaintiffs have requested both declaratory and injunctive relief. Accordingly, if plaintiffs have satisfied the other prerequisites for the exercise of federal jurisdiction, the prayer for declaratory relief provides a basis for this action under *Steffel*. The question of possible injunctive relief will be discussed later.

■ The first questions are whether plaintiffs have standing to challenge these ordinances, and, if so, whether their challenge is ripe for adjudication. Standing requires that the ordinances pose a direct, immediate threat to plaintiffs' rights. There can be no question of plaintiffs' standing to challenge # 996: it is conceded that plaintiffs comprise a political party whose members customarily wear military-style uniforms, and if they carry out their planned demonstration in Skokie they will be in clear violation of the ordinance. As to # 995, the question is slightly less clear since plaintiffs' application stated that they do not intend to distribute literature, hate-inciting or otherwise, in Skokie. However, as discussed below, the definition of "dissemination of materials" in # 995 is quite broad, and specifically includes display of signs and wearing of clothing "of symbolic significance". Moreover, the court finds that ordinance # 995 was specifically intended to apply to the display of Nazi regalia and propaganda.[4] The "clothing of symbolic significance" clause was clearly directed at plaintiffs' Third Reich style uniforms and swastikas, and much of defendants' evidence dealt with the significance of these symbols to Jewish survivors of World War II. Accordingly, there is a substantial probability that any demonstration by plaintiffs in Skokie would result in their arrest for violation of # 995, and plaintiffs have standing to challenge the ordinance.

■ The only standing question with regard to # 994 is whether plaintiffs need a permit at all, since their proposed assembly would consist only of 30 to 50 persons. The ordinance actually requires a permit for any assembly in which the number of participants "may reasonably be assumed to exceed 50", § 27–51. Thus, one who holds an assembly without a permit which more than 50 persons attend would violate the ordinance if it were found that he should have reasonably assumed more than 50 would attend. In light of the criminal penalties the ordinance imposes for lack of foresight, the court feels that plaintiffs are the best judge of their need for a permit and have standing to challenge # 994.

■ The only thing currently keeping plaintiffs from demonstrating in Skokie and violating ordinances # 995 and # 996 is their inability to obtain a permit under # 994; accordingly, if their challenge to # 994 is ripe for adjudication, the challenges to # 995 and # 996 are also ripe. This leaves a ripeness problem only as to # 994. Since defendant Matzer denied the permit application solely on the basis of # 996, defendants have never officially considered whether the application satisfied the insurance requirement or the "no incitement of racial hatred" requirement. However, ripeness is a practical doctrine, which should not be employed to require the parties to satisfy empty formalities when the issues between them are clearly defined. As discussed below, plaintiffs have proved that they cannot obtain the required insurance, and it is virtually certain that defendants would refuse to waive the requirement in light of their implacable opposition to plaintiffs' presence in Skokie. Similarly,

---

4. The wording of the ordinances and the context in which they were enacted leave no doubt that they were intended to cover demonstrations by Nazi organizations. However, this finding is merely one of legislative intent to aid the court in interpreting the ordinances; plaintiffs have not sought to prove that the ordinances are so clearly directed against them alone as to constitute bills of attainder. A law of general applicability is not unconstitutional merely because its enactment was inspired by a specific example of the evil which it seeks to suppress.

the court's finding that these ordinances were specifically intended to apply to plaintiffs makes it equally certain that plaintiffs' application would be denied under the incitement of hatred standard. Further, although plaintiffs could force a decision on the insurance issue by agreeing not to wear uniforms, there is no way they could avoid the insurance problem in order to force a decision on the racial hatred issue. Accordingly, the court finds that the issues between the parties are ripe for adjudication under each of the three ordinances.

■■■■ Thus, the court has jurisdiction over this case. Whether it may properly exercise that jurisdiction depends on the doctrines of exhaustion of remedies and abstention. Plaintiffs could have appealed the denial of their permit application to the Village Board of Trustees, under § 27–57, and then filed an action for judicial review in state court under the Illinois Administrative Review Act, Ill.Rev.Stat. ch. 110, §§ 264, *et seq.* A plaintiff is never required to exhaust administrative remedies when to do so would be obviously futile. *Porter County Chapter of the Izaak Walton League of America v. Costle*, 571 F.2d 359, at 264, Dkt. Nos. 76–2098 and 77–1262 (7th Cir. Jan. 30, 1978), Slip Op. at 6. This is especially true in civil rights cases, where the congressional policy of providing a federal forum for vindication of constitutional rights is particularly strong. *Monroe v. Pape*, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961); *see Drexler v. Southwest Dubois School Corp.*, 504 F.2d 836, 838–39 (7th Cir. 1974). For the reasons discussed above, the court finds that an appeal to the Board of Trustees would be futile in this case. Moreover, there is no reason to require plaintiffs to proceed under the Administrative Review Act when their claims are based upon freedom of speech rather than administrative procedure. Exhaustion is not required.

Although abstention is generally not favored in civil rights cases, *Drexler, supra,* the question arises in this case due to the ongoing state court litigation between the parties, the subject of which to some degree overlaps this case. As noted above, defendants in this case obtained a preliminary injunction from the Circuit Court of Cook County, which prohibited plaintiffs from demonstrating at all in Skokie, from wearing their uniforms and swastikas there, and from distributing materials which incite racial hatred. The Illinois Appellate Court for the First District modified the injunction to prohibit only display of the swastika, on the grounds that as to the other issues the Village had not met its extraordinary burden of showing an immediate harm which would justify preliminary injunctive relief in a case raising First Amendment issues. *Village of Skokie v. National Socialist Party of America,* 51 Ill.App.3d 279, 9 Ill.Dec. 90, 366 N.E.2d 347 (1st Dist.1977). On appeal, the Illinois Supreme Court held that the preliminary injunction forbidding the display of the swastika was also improper in light of the presumptive unconstitutionality of any prior restraint on speech. Dkt. No. 49769, Ill., 14 Ill.Dec. 890, 373 N.E.2d 21, Jan. 27, 1978. The Village did not cross-appeal the Appellate Court's modification of the injunction, apparently because the subject matter of the part of the injunction vacated by the Appellate Court was by then covered by the ordinances involved in this suit.

■■■■ The federal courts must abstain from deciding a constitutional question when there is an unresolved question of state law which could either moot the constitutional question or substantially alter it. *Railroad Commission of Texas v. Pullman Co.,* 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed.2d 971 (1941). Abstention would be improper in a case merely because the same federal law questions presented are also being litigated in another case. *Colorado River Water Cons. Dist. v. United States,* 424 U.S. 800, 817–19, 96 S.Ct. 1236, 47 L.Ed.2d 483 (1976). The court has examined the briefs and decisions in the state court litigation between the parties, and there appears to be no substantial unresolved issue of state law there involved which would affect this case. Moreover, in the present posture of the state case, the overlap in issues between

the two actions is actually quite small. The only question actually decided by the Illinois Supreme Court, which the Village is now seeking to take to the United States Supreme Court, is whether the use of a specific symbol—the swastika—can be enjoined in a situation where it may be emotionally damaging to a specific group of persons,[5] whereas this case is concerned with the impact of a broad range of municipal ordinances on many kinds of speech and speech-related behavior. Accordingly, the court finds that it is not required to abstain from deciding this case.

This court's opinion will now deal with the federal question whether the three ordinances under review impermissibly limit and burden the exercise of free speech and assembly in Skokie.

### III. The Insurance Ordinance

Section 27–54 of Ordinance # 994 provides that:

> "No permit shall be issued to any applicant until such applicant procures Public Liability Insurance in an amount of not less than Three Hundred Thousand Dollars ($300,000.00) and Property Damage Insurance of not less than Fifty Thousand Dollars ($50,000.00). Prior to the issuance of the permit, certificates of such insurance must be submitted to the Village Manager for verification that the company issuing such insurance is authorized to do business and write policies of insurance in the State of Illinois."

In addition, § 27–56(j) specifically requires the Village Manager to deny a permit to any person failing to comply with § 27–54. The requirement may be waived by a unanimous vote of the President and Board of Trustees, § 27–64. Staging a public assembly without a permit is punishable by a $5 to $500 fine, § 27–65.

In *Collin v. O'Malley,* Dkt. No. 76 C 2024, in which the plaintiffs were the same as the plaintiffs here, Judge Leighton of this court held that a virtually identical ordinance of the Chicago Park District violated the First Amendment because its effect was to completely preclude organizations such as the National Socialist Party from staging public assemblies in the parks. The record in *O'Malley* has been admitted into evidence in this case by stipulation, but defendants do not stipulate to Judge Leighton's findings or conclusions and this court must make its own review of the record.

The court is in complete agreement with Judge Leighton's finding that insurance of the type required by the Skokie and Park District ordinances is beyond the reach of plaintiffs. Janet Jarosz, a licensed insurance broker, testified in *O'Malley* that she had made a continuing effort for four or five months to obtain such insurance for plaintiffs without success. She contacted 13 separate companies and brokerage firms without success, including several that specialize in unusual and hard to place lines of insurance. She gave as her professional opinion the conclusion that plaintiffs could not obtain the insurance, because insurance companies are simply not interested in writing the kind of policy required due to the unknown risks involved, and consequently will write the policies only as an accommodation to well-established and respectable organizations. In an affidavit executed for this action, Jarosz stated that she had made additional efforts to obtain the insurance for plaintiffs as recently as August, 1977, and she reaffirmed her original conclusions. Jarosz also testified that if the insurance were available to plaintiffs, the premium would be as much as $1,000 for each event. Neither the *O'Malley* defendants nor the defendants in this case presented any evidence to contradict Jarosz's testimony.

---

**5.** Immediately after vacating the Village's injunction, the Illinois Supreme Court granted interlocutory review in *Sol Goldstein v. Franklin Collin,* an action by a resident of Skokie seeking to enjoin the planned demonstration on the grounds that it would harm him as a survivor of the Nazi holocaust in World War II. The Court summarily ordered the action dismissed without briefing or argument. A petition for rehearing is pending. This case could potentially raise issues relevant to Part IV.D. of this opinion, but in view of the treatment the Court has given the case, it does not justify abstention. This court, of course, expresses no opinion as to the merits of plaintiffs' position in that case.

The law regarding use of public streets for demonstrations was set down in the plurality opinion of Mr. Justice Roberts in *Hague v. C.I.O.,* 307 U.S. 496, 515–16, 59 S.Ct. 954, 964, 83 L.Ed. 1423 (1939):

> "Wherever the title of streets and parks may rest, they have immemorially been held in trust for the use of the public and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions. Such use of the streets and public places has, from ancient times, been a part of the privileges, immunities, rights, and liberties of citizens. The privilege of a citizen of the United States to use the streets and parks for communication of views on national questions may be regulated in the interest of all; it is not absolute, but relative, and must be exercised in subordination to the general comfort and convenience, and in consonance with peace and good order; but it must not, in the guise of regulation, be abridged or denied."

The ordinance under review in effect bans all public assemblies above a certain size within the Village unless the sponsoring organization either has the wherewithal to obtain a rare and expensive form of insurance policy or receives an exemption from the ordinance's coverage. The court concludes that this drastic restriction of the right of freedom of speech and assembly is an abridgement "in the guise of regulation." There are two bases for this conclusion.

First, the burdensome effect of the insurance requirement itself has not been shown to be necessary. The government may impose financial burdens on the exercise of First Amendment rights, such as permit fees, only when the amount involved is reasonable and directly related to the accomplishment of legitimate governmental purposes. *Cox v. New Hampshire,* 312 U.S. 569, 576–77, 61 S.Ct. 762, 85 L.Ed. 1049 (1941); *United States Labor Party v. Codd,*

527 F.2d 118 (2d Cir. 1975); *see also Lubin v. Panish,* 415 U.S. 709, 94 S.Ct. 1315, 39 L.Ed.2d 702 (1974); *Bullock v. Carter,* 405 U.S. 134, 92 S.Ct. 849, 31 L.Ed.2d 92 (1972). In this case, defendants have presented no evidence whatsoever of the Village's need for such a burdensome insurance requirement. Nothing in the record shows that Skokie or any comparable municipality has ever been threatened with damage by a public assembly which would have been prevented or alleviated by an insurance requirement of this type.

Second, the ordinance is objectionable because some organizations may be exempted from its requirements and there are no principled standards for determining which organizations are exempt. In addition to the specific waiver provision of § 27–56, any activity sponsored by a governmental agency is exempt. The record shows that the device of "co-sponsorship" by the Village itself and related entities such as the Skokie Park District has enabled groups such as the Northeast Skokie Property Owners Association and the American Legion to escape the insurance requirement. This device permits organizations that have the approval of the Village government to avoid the restrictions imposed on all other groups, with no indication that such exemptions have been or will be granted on the basis of the threat of liability or property damage posed by their activities.[6] It is well established that permit systems which are so devoid of standards that they allow government officials to engage in covert censorship in their administration are particularly vulnerable to First Amendment challenge. *Hague, supra,* 307 U.S. at 516, 59 S.Ct. 954; *see also Shuttlesworth v. City of Birmingham,* 394 U.S. 147, 150–51, 89 S.Ct. 935, 22 L.Ed.2d 162 (1969); *Cox v. Louisiana,* 379 U.S. 536, 555–58, 85 S.Ct. 453, 13 L.Ed.2d 471 (1965).

In short, the court finds that §§ 27–54 and 27–56(j) of Ordinance # 994 impose a

---

**6.** Defendant Matzer conceded that there were no written standards governing waiver or co-sponsorship. In fact, the ordinance contains no explicit provision for co-sponsorship at all;

the adoption of this device by the Village government is a further indication of the standardless manner in which the insurance requirement has been enforced.

virtually insuperable obstacle to the free exercise of First Amendment rights in the Village of Skokie, which obstacle has not been proven to be justified by the legitimate needs of the Village and which may be disposed of at the uncontrolled and standardless discretion of the Village government. These sections are, accordingly, unconstitutional on their face.[7]

## IV. *The "Racial Slur" Ordinances*

### A. *Introduction*

Ordinance # 995 and § 27–56(c) of # 994 are both directed at a type of speech that the parties have characterized generally as "racial slurs". A more precise definition can be formulated only in the context of a discussion of the ordinances themselves. For the sake of convenience, the court will also use the same term. Section 28–43.1 of Ordinance # 995 provides that:

"The dissemination of any materials within the Village of Skokie which promotes and incites hatred against persons by reason of their race, national origin, or religion, and is intended to do so, is hereby prohibited."[8]

"Dissemination of materials" is defined by § 28–43.2 to include:

"publication or display or distribution of posters, signs, handbills, or writings and public display of markings and clothing of symbolic significance."

Violation of Ordinance # 995 is a misdemeanor punishable by a fine of up to $500 and/or imprisonment for up to six months, § 29–43.4. The Corporation Counsel is authorized to seek injunctive relief against prospective violations, § 29–43.5.

Section 27–56(c) covers the same subject, but is worded somewhat differently. It requires the Village Manager to deny a permit for any assembly which will:

"portray criminality, depravity or lack of virtue in, or incite violence, hatred, abuse or hostility toward a person or group of persons by reason of reference to religious, racial, ethnic, national or regional affiliation."

The different issues raised by this ordinance will be discussed after the analysis of Ordinance # 995.

It is apparent that in enacting these ordinances, the Village government acted primarily to shield its citizens—and particularly its Jewish citizens—from the flaunting by plaintiffs of the symbols of a hated era and repugnant political philosophy. The ordinances adopted, however, do more than simply ban display of the swastika; they impose sweeping bans on the content of speech within Skokie and include provisions for which there is almost no precedent in constitutional law. The importance and novelty of the issues involved requires a close re-examination of the basic principles of the First Amendment against which these ordinances must be measured.

### B. *Fundamental Principles*

■ It must be made clear from the outset that defendants have no power to prevent plaintiffs from stating their political philosophy, including their opinions of black and Jewish people, however noxious and reprehensible that philosophy may be. The Supreme Court has held that "above all else, the First Amendment means that government has no power to restrict expression because of its message, its ideas, its

---

7. Plaintiffs have also introduced some evidence indicating that the requirement that permits be filed 30 days before the scheduled activities, § 27–52, has been waived by the Village Manager in an arbitrary manner. However, the evidence as a whole does not show a clearly discriminatory pattern of granting waivers of this requirement, and the requirement does not appear to be particularly burdensome. If plaintiffs were trying to prove that this requirement unduly restricts free speech, they have failed to do so.

8. The use of the verbs "promotes" and "incites" would seem to indicate that the dependent clause modifies the singular "dissemination" rather than the plural "materials", but it appears from the remainder of the ordinance and its use throughout the parties' briefs that the ordinance is understood to prohibit materials which promote and incite as opposed to dissemination which does so.

subject matter, or its content." *Police Department of the City of Chicago v. Mosely,* 408 U.S. 92, 95, 92 S.Ct. 2286, 2290, 33 L.Ed.2d 212 (1972).

The principle derives from the theory of the "marketplace of ideas". As the Court has recently stated the theory: "there is no such thing as a false idea. However pernicious an opinion may seem, we depend for its correction not on the conscience of judges and juries but on the competition of other ideas." *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 339–40, 94 S.Ct. 2997, 3007, 41 L.Ed.2d 789 (1974). This theory has recently been the subject of considerable criticism, and the underlying basis of defendants' position, as well as much of the commentary on this case, seems to be that plaintiffs' philosophy is so thoroughly repugnant to any concept of civilized society that it is not entitled to entry into the "marketplace". As the late Prof. Alexander Bickel has argued, to permit an idea to be advocated is to concede its legitimacy and impliedly accept the possibility that it may be accepted and implemented as a social policy; and there are some policies whose implementation would be so completely unacceptable in a democratic society that their advocacy should not be permitted. A. Bickel, *The Morality of Consent,* 70–77 (1975).

This interpretation of the marketplace of ideas principle gains support from Supreme Court statements such as that of the *Gertz* Court that "there is no such thing as a false idea", and from the opinions of Justice Oliver Wendell Holmes, the judge most responsible for incorporation of the marketplace concept into the First Amendment. *See Gitlow v. New York,* 268 U.S. 652, 673, 45 S.Ct. 625, 69 L.Ed. 1138 (1925) (Holmes, J., dissenting). And it is undoubtedly true that if any philosophy should be regarded as completely unacceptable to civilized society, that of plaintiffs, who, while disavowing on the witness stand any advocacy of genocide, have nevertheless deliberately identified themselves with a regime whose record of brutality and barbarism is unmatched in modern history, would be a good place to start.

This criticism of the marketplace of ideas theory is, however, based on an incorrect interpretation of the theory's premises. The early English libertarian philosophers who developed the concept did not believe that, in the *Gertz* Court's somewhat unfortunate phrase, "there is no such thing as a false idea." They believed that false ideas existed; and that the process of free debate could be relied upon to identify false ideas, but that the government could not. See J. Milton, *Areopagitica—A Speech for the Liberty of Unlicensed Printing* (1644); J. S. Mill, *On Liberty,* ch. II (1859). The words of Mr. Justice Brandeis remain the classic exposition of this principle in the context of American constitutional law:

> "Those who won our independence believed . . . that freedom to think as you will and to speak as you think are means indispensable to the discovery and spread of political truth; that without free speech and assembly discussion would be futile; that with them, discussion affords ordinarily adequate protection against the dissemination of noxious doctrine; that the greatest menace to freedom is an inert people; that public discussion is a political duty; and that this should be a fundamental principle of the American government. They recognized the risks to which all human institutions are subject. But they knew that order cannot be secured merely through fear of punishment for its infraction; that it is hazardous to discourage thought, hope and imagination; that fear breeds repression; that repression breeds hate; that hate menaces stable government; that the path of safety lies in the opportunity to discuss freely supposed grievances and proposed remedies; and that the fitting remedy for evil counsels is good ones. Believing in the power of reason as applied through public discussion, they eschewed silence coerced by law—the argument of force in its worst form." *Whitney v. California,* 274 U.S. 357, 375–76, 47 S.Ct. 641, 648, 71 L.Ed. 1095 (1927) (Brandeis, J., concurring) (footnote omitted).

The question, then, is not whether there are some ideas that are completely unacceptable in a civilized society. Rather the question is which danger is greater: the danger that allowing the government to punish "unacceptable" ideas will lead to suppression of ideas that are merely uncomfortable to those in power; or the danger that permitting free debate on such unacceptable ideas will encourage their acceptance rather than discouraging them by revealing their pernicious quality. This question is one of the fundamental dilemmas of free speech, and it is certainly open to public debate, but for the purposes of this case, the question has been definitively settled by the Supreme Court.

From the beginning the Court has held that speech may be punished only when it actually causes some social harm which the government can legitimately prevent. *See Schenck v. United States*, 249 U.S. 47, 39 S.Ct. 247, 63 L.Ed. 470 (1919). For many years, however, the Court held that certain doctrines, such as the violent overthrow of the government, were so inherently harmful to society that their mere advocacy in any form could be prohibited. *Abrams v. United States*, 250 U.S. 616, 40 S.Ct. 17, 63 L.Ed. 1173 (1919); *Gitlow, supra; Whitney, supra*. Justices Holmes and Brandeis consistently dissented from these opinions on the grounds that allowing the prohibition of mere advocacy would inevitably lead to untrammeled censorship. They took the position that advocacy even of violence or lawlessness could be punished only when it occurred in a situation in which the advocacy posed a "clear and present danger" of actually inciting the lawless actions advocated.

The Holmes-Brandeis approach gained ascendancy through the 1940's and 1950's as the Court retreated from the position that all advocacy of Communism could be prohibited. *See Dennis v. United States*, 341 U.S. 494, 502–11, 71 S.Ct. 857, 95 L.Ed. 1137 (1951), (plurality opinion). In *Yates v. United States*, 354 U.S. 298, 77 S.Ct. 1064, 1 L.Ed.2d 1356 (1957), the Court attempted to draw a distinction between "abstract" advocacy, which is protected by the First Amendment, and advocacy "directed to stirring people to action", *id.* at 326–27, 77 S.Ct. at 1081. This standard proved practically unworkable, and in *Brandenburg v. Ohio*, 395 U.S. 444, 89 S.Ct. 1827, 23 L.Ed.2d 430 (1969), the Court abandoned the attempt to define kinds of advocacy which are sufficiently dangerous in themselves to warrant suppression. It adopted the Brandeis position in *Whitney*, and held that advocacy of any idea can be prohibited only when it is both intended to and likely to incite "imminent lawless action".

Since the Court has thus squarely rejected the theory that some ideas are too dangerous to permit their advocacy, it follows that plaintiffs have the right to advocate their political views within Skokie. The question remains, whether Ordinance # 995 unacceptably restricts their ability to do so.

## C. "Unprotected" Speech and Fighting Words

As discussed above, the central issue in First Amendment cases is the constant tension between the policy of permitting unrestricted exchange and discussion of ideas and the government's legitimate interest in preventing the harms that may be caused by speech. When the speech involved takes the form of the advocacy of ideas, *Brandenburg* establishes that only harm serious enough to justify its restriction is the imminent threat of lawless action. Defendants in this case have disclaimed any reliance on *Brandenburg*, stating: "The Village *does not* contend that the forbidden conduct [speech which intentionally incites racial hatred] will create a clear and present danger of violence, riot, breach of peace, or other disorders." Defendant's Brief in Response to Plaintiffs' Memorandum of Law, at 2 (emphasis in original).

Thus, the ordinances may not prohibit advocacy which falls short of incitement of imminent lawless action. However, it has long been established that certain kinds of language are of so little utility in the conveyance of ideas that they can be prohibited

on the basis of harms less serious than the threat of imminent lawlessness. Such speech is generally referred to as "unprotected", and it includes "the lewd and obscene, the profane, the libelous, and the insulting or 'fighting' words—those which by their very utterance inflict injury or incite an immediate breach of the peace." *Chaplinsky v. New Hampshire*, 315 U.S. 568, 572, 62 S.Ct. 766, 769, 86 L.Ed. 1031 (1942). Defendants' position is that language which intentionally incites racial hatred is unprotected speech.

Before examining the merits of this argument, the court notes that the term "unprotected speech" is something of a misnomer, for in reality all speech derives considerable protection from the First Amendment. The reason is that determination of whether speech is valueless and therefore unprotected inevitably involves to some extent an inquiry into its content, and thus raises the possibility that the speech will be suppressed in part because of the offensiveness of the idea it conveys. *See Young v. American Mini Theatres, Inc.*, 427 U.S. 50, 65–67, 96 S.Ct. 2440, 49 L.Ed.2d 310 (1976) (plurality opinion). In order to counteract this tendency and insure the free flow of debate, the Court has developed the theory that First Amendment values require "breathing space". In other words, the government is not only prohibited from regulating protected speech directly, it is also prohibited from impinging too closely upon it and thereby dampening the vigor of debate. This principle requires all First Amendment cases to be considered "against the background of a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials." *New York Times Co. v. Sullivan*, 376 U.S. 254, 270, 84 S.Ct. 710, 721, 11 L.Ed.2d 686 (1964). That such an approach will often protect speech which could be prohibited if laws could be drafted and enforced with perfect clarity and precision is regarded as the price which must be paid for the full preservation of First Amendment values.

Thus, there are actually two questions involved here: whether "racial slurs" are unprotected speech; and, if so, whether the definition of racial slurs employed by Ordinance # 995 is sufficiently precise to reach only unprotected slurs and allow adequate breathing space for protected speech.

The doctrine of unprotected speech was first developed in cases involving abusive epithets and insults. In *Cantwell v. Connecticut*, 310 U.S. 296, 60 S.Ct. 900, 84 L.Ed. 1213 (1940), and *Chaplinsky v. New Hampshire*, 315 U.S. 568, 62 S.Ct. 766, 86 L.Ed. 1031 (1942), members of the Jehovah's Witnesses sect were convicted of inciting breaches of the peace on the basis of their use of language which the Court characterized as highly offensive. The *Cantwell* Court began with the premise that "[r]esort to epithets or personal abuse is not in any proper sense communication of information or opinion safeguarded by the Constitution . . . ." 310 U.S. at 309–10, 60 S.Ct. at 906. The *Chaplinsky* Court added that while such speech might have a "slight social value as a step to truth", such a slight value is "clearly outweighed by the social interest in order and morality." 315 U.S. at 572, 62 S.Ct. at 769.

This analysis would seem to suggest that the government may generally prohibit speech which is not a communication of ideas or opinion. The Court, however, avoided such a broad approach to the restriction of unprotected speech in favor of an inquiry into the conduct of the speaker, the circumstances in which the speech was employed, and the actual likelihood that it would provoke a breach of the peace. Cantwell's speech had consisted of a phonograph record which he played on a public street. He had asked permission to play the record, had stopped when asked to do so, and had at no time been belligerent, offensive or truculent. His conviction was reversed. Chaplinsky, on the other hand, had called another a "damned racketeer" and "damned Fascist" to his face in a belligerent manner; his conviction was affirmed.

This narrow approach to unprotected speech was emphasized by *Terminiello v. City of Chicago*, 337 U.S. 1, 69 S.Ct. 894, 93 L.Ed. 1131 (1949). Terminiello was convicted for disorderly conduct on the basis of an inflammatory speech filled with offensive epithets. The trial court charged the jury that the offense included conduct which "stirs the public to anger, invites dispute, brings about a condition of unrest, or creates a disturbance." The Illinois Supreme Court affirmed, finding no constitutional problem since Terminiello's speech had been so offensive and insulting that it was unprotected under *Cantwell* and *Chaplinsky*. *See* 400 Ill. 23, 34–35, 79 N.E.2d 39 (1948). The Supreme Court reversed without even considering whether the speech was unprotected. Inviting dispute, creating unrest and stirring anger are among the "high purposes" of free debate, the Court said, and therefore no speech could be punished merely because it accomplished those purposes.

■ Thus, *Cantwell, Chaplinsky* and *Terminiello* established a two-part test for the restriction of the "fighting words" class of unprotected speech. The speech must, considered objectively, be abusive and insulting rather than a communication of ideas, and it must actually be used in an abusive manner in a situation which presents an actual danger that it will cause a breach of the peace. The fighting words concept has continued to dominate later unprotected speech cases, which have built upon these basic principles.

■ First, the Court has several times emphasized that care must be taken to insure that what is restricted is insulting and offensive *language*, not the communication of offensive *ideas*. "It is firmly settled that under our Constitution the public expression of ideas may not be prohibited merely because the ideas themselves are offensive to some of their hearers." *Street v. New York*, 394 U.S. 576, 592, 89 S.Ct. 1354, 1366, 22 L.Ed.2d 572 (1969); *see Organization for a Better Austin v. Keefe*, 402 U.S. 415, 419, 91 S.Ct. 1575, 29 L.Ed.2d 1 (1971); *Bachellar v. Maryland*, 397 U.S. 564, 90 S.Ct. 1312,

25 L.Ed.2d 570 (1970). Even where the audience is so offended by the ideas being expressed that it becomes disorderly and attempts to silence the speaker, it is the duty of the police to attempt to protect the speaker, not to silence his speech if it does not consist of unprotected epithets. *Gooding v. Wilson*, 405 U.S. 518, 527, 92 S.Ct. 1103, 31 L.Ed.2d 408 (1972); *Gregory v. City of Chicago*, 394 U.S. 111, 89 S.Ct. 946, 22 L.Ed.2d 134 (1969); *Cox v. Louisiana*, 379 U.S. 536, 546–48, 85 S.Ct. 453, 13 L.Ed.2d 471 (1965).

In *Cohen v. California*, 403 U.S. 15, 91 S.Ct. 1780, 29 L.Ed.2d 284 (1971), the Court discussed in detail the rule that even unprotected speech may only be suppressed when it threatens a harm. Cohen had worn a jacket inscribed with the phrase "Fuck the Draft", and was convicted of "maliciously and willfully disturb[ing] the peace or quiet of any neighborhood or person . . . by . . . offensive conduct." The Court began by restating the objective element of the test: fighting words, it said, are "those personally abusive epithets, which, when addressed to the ordinary citizen, are, as a matter of common knowledge, inherently likely to provoke violent reaction." Cohen's choice of language, it said, would satisfy this test. 403 U.S. at 20, 91 S.Ct. at 1785.

Nevertheless, the Court reversed Cohen's conviction on the ground that in Cohen's case there was no showing that the speech had been used in a context which even made the occurrence of breach of the peace a possibility: "No individual actually or likely to be present could reasonably have regarded the words on appellant's jacket as a direct personal insult . . . There is . . . no showing that anyone who saw Cohen was in fact violently aroused or that appellant intended such a result." *Id.*

Although the government need not prove an actual threat of an imminent breach of the peace in order to restrict unprotected speech, the Court said in *Cohen* the state's position amounted to an assertion that it could ban certain offensive epithets even without showing a possible breach, either

because such epithets are inherently likely to cause violent reactions or in order to maintain a "suitable level of discourse within the body politic." Neither rationale, the Court said, was strong enough to justify establishing the "inherently boundless" precedent that the government could ban certain forms of language solely because of their offensiveness. To permit such bans would place unacceptable restrictions on free and uninhibited debate. The Court concluded:

"To many, the immediate consequence of this freedom may often appear to be only verbal tumult, discord, and even offensive utterance. These are, however, within established limits, in truth necessary side effects of the broader enduring values which the process of open debate permits us to achieve. That the air may at times seem filled with verbal cacophony is, in this sense not a sign of weakness but of strength." 403 U.S. at 24–25, 91 S.Ct. at 1788.

In light of these principles, it is apparent that the line between protected and unprotected speech in matters relating to race and religion is an extraordinarily difficult one to draw. On the one hand, slurs and insults which rely upon the victim's racial and religious heritage are among the most vicious and abusive epithets known. As Mr. Justice Jackson has written:

"These terse epithets come down to our generation weighted with hatreds accumulated through centuries of bloodshed . . . They are not in that class of epithets whose literal sting will be drawn if the speaker smiles when he uses them. They are always, and in every context, insults which do not spring from reason and can be answered by none. Their historical associations with violence are well understood, both by those who hurl and those who are struck by these missiles . . . " *Kunz v. New York*, 340 U.S. 290, 299, 71 S.Ct. 312, 317, 95 L.Ed. 280 (1951) (Jackson, J., dissenting).[9]

On the other hand, it is equally clear that discussion of race and religion will often involve the exposition of ideas and positions that are inherently offensive to many, but which are nevertheless protected by the First Amendment. We live in a society that is very conscious of racial and religious differences, in which open discussion of important public issues will often require reference to racial and religious groups, often in terms which members of those groups, and others, would consider insulting and degrading. To choose an obvious example, discussion of the use of mandatory quotas in affirmative action programs cannot help but touch upon characteristics perceived to be shared by members of particular racial groups. The First Amendment does not permit the government to restrict discussion of such sensitive and emotion charged public issues to the sanitary prose of legal and social sciences technical jargon. *Cf. Bond v. Floyd*, 385 U.S. 116, 127, 134–45, 87 S.Ct. 339, 17 L.Ed.2d 235 (1966).

The question remains whether the language of Ordinance # 995 is sufficiently precise to focus exclusively on the personally abusive use of epithets in situations where the possibility of breaches of the peace justifies the epithets' suppression and still permit the intemperate and emotional debate which may accompany any discussion of race and religion. Our courts have employed the doctrines of vagueness and of overbreadth to make this determination.

A law is unconstitutionally vague when it fails to give reasonable notice of the conduct which is prohibited and gives law enforcement personnel the opportunity to enforce it according to their personal prejudices. *Smith v. Goguen*, 415 U.S. 566, 94 S.Ct. 1242, 39 L.Ed.2d 605 (1974). In First Amendment cases the doctrine has an added dimension, since a vague statute which covers speech-related activities may be enforced only against those who express unpopular opinions and thus be used as a device for censorship. *Grayned v. City of*

---

**9.** Although Justice Jackson's opinion was written in dissent, the passage cited dealt with a question not reached by the Court.

*Rockford*, 408 U.S. 104, 108–114, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972).

Statutes which punish speech solely on the basis of the emotion it arouses in other persons are vulnerable to findings of vagueness, *see, e. g., Ashton v. Kentucky*, 384 U.S. 195, 199–201, 86 S.Ct. 1407, 16 L.Ed.2d 469 (1966), particularly where the emotion involved is subjective and difficult to define with precision. *Smith v. Goguen, supra*, invalidated a law punishing "contemptuous" treatment or display of the American flag, on the grounds that in an era in which the flag is often treated casually, the precise conduct which could be considered "contemptuous" and result in criminal sanctions was impossible to define. Similarly, *Coates v. City of Cincinnati*, 402 U.S. 611, 91 S.Ct. 1686, 29 L.Ed.2d 214 (1971), struck down an ordinance which prohibited groups of people from conducting themselves in an "annoying" manner on a public street. The Court held that the First Amendment right of free assembly could not be conditioned upon compliance with a purely subjective standard such as "annoyance".

The Skokie ordinance punishes language which intentionally incites hatred. This standard is as subjective and impossible to clearly define as the standards found impermissible in *Smith* and *Coates*. *Terminiello* and its progeny establish that there is a constitutional right to incite unrest, dissatisfaction, and even anger with social conditions. The distinction between inciting anger with a social condition and hatred of the person or group perceived to be responsible for that condition is impossible to draw with the requisite clarity, and depends to a great extent upon the frame of mind of the listener. For example, plaintiffs believe that busing school children in order to accomplish integration is a threat to the integrity and quality of the public school system, and they also believe that blacks and Jews are the instigators of busing. They clearly have a constitutional right to say so, and to say so vehemently and force-

fully. But at what point does a vehement attempt to arouse public anger at busing become an attempt to incite hatred of blacks and Jews? A society which values "uninhibited, robust and wide-open" debate cannot permit criminal sanctions to turn upon so fine a distinction. Ordinance # 995 is unconstitutionally vague.

Even assuming that the distinction can be defined with sufficient clarity, however, the court also finds that the Ordinance is overbroad. A law is overbroad for First Amendment purposes when, even though it is directed at unprotected speech, it can also be applied to protected speech. Such a law is considered completely unconstitutional on its face even though it is capable of application in a constitutional manner, on the theory that the very existence of laws which can be applied to protected speech exercises an unacceptable inhibiting effect on free debate. In *Gooding v. Wilson*, 405 U.S. 518, 92 S.Ct. 1103, 31 L.Ed.2d 408 (1972), the Court struck down a Georgia statute punishing the use of "opprobrious words or abusive language, tending to cause a breach of the peace", language which would seem to conform with the definition of fighting words. The Court found, however, that as construed by the Georgia courts, the phrase "tending to cause a breach of the peace" referred to the inherent character of the language rather than the circumstances in which it was used. As discussed above, the punishment of even abusive language inherently likely to cause breaches of the peace was found unacceptable in *Cohen*. Therefore, the statute was "susceptible of application to speech, although vulgar or offensive, that is protected by the First . . . Amendment", and was unconstitutional on its face. For examples of the stringency with which this test is applied, *see Rosenfeld v. New Jersey*, 408 U.S. 901, 92 S.Ct. 2479, 33 L.Ed.2d 321 (1972); *Lewis v. City of New Orleans*, 408 U.S. 913, 92 S.Ct. 2499, 33 L.Ed.2d 321 (1972).[10]

**10.** Although the Court merely vacated *Rosenfeld* and *Lewis* for reconsideration in light of *Gooding* and *Cohen*, the statutes involved were

quite narrowly phrased and construed by the state courts, and the fact that the Court even felt it necessary to vacate for reconsideration is

The Skokie ordinance punishes the mere "dissemination" of material which incites hatred, with dissemination broadly defined to include such relatively passive activities as distributing leaflets and wearing "symbolic" clothing. It is clearly not aimed solely at personally abusive, insulting behavior, as was required by *Cohen* and *Gooding*. The court cannot agree that the requirement that the language intentionally incite hatred is an adequate substitute for this limitation.

It may very well be true that hatred tends to spawn violence and that, unlike the unrest and dissatisfaction referred to in *Terminiello*, hatred serves no useful social function in itself. Nevertheless, the incitement of hatred is often a byproduct of vigorous debate on highly emotional subjects, and the basic message of *Cohen* is that a great deal of useless, offensive and even potentially harmful language must be tolerated as part of the "verbal cacophony" that accompanies uninhibited debate, not for its own sake, but because any attempt to excise it from the public discourse with the blunt instrument of criminal sanctions must inevitably have a dampening effect on the vigor of that discourse. The Court has repeatedly rejected attempts to ban certain kinds of language on the basis of an "undifferentiated fear or apprehension of disturbance . . . " *Tinker v. Des Moines Independent Community School District*, 393 U.S. 503, 508, 89 S.Ct. 733, 737, 21 L.Ed.2d 731 (1969).

The requirement that speech pose an imminent danger of violence before it may be suppressed is relaxed to a great extent when the speech serves no useful social purpose, but Ordinance # 995 seeks to dispense with the requirement entirely, and this it may not do. The ordinance is unconstitutionally overbroad.

## D. *Beauharnais v. Illinois*

The foregoing discussion has assumed that the only danger posed by racial slurs is that of imminent breach of the peace. This is the ordinary fighting words rationale for the suppression of offensive epithets, which under *Chaplinsky* include those which either incite breaches of the peace or "by their very utterance inflict injury." Defendants argue that racial slurs fall into this second category of speech-inflicted harms, and have presented psychiatric evidence showing the mental and emotional trauma that can be caused by such slurs.[11] Unlike epithets which cause breaches of the peace, those which inflict emotional trauma have attracted comparatively little judicial attention.

The keystone of defendants' argument in this uncharted field is *Beauharnais v. Illinois*, 343 U.S. 250, 72 S.Ct. 725, 96 L.Ed. 919 (1952), in which the Court upheld an Illinois criminal libel statute which made it unlawful:

> "for any person . . . to manufacture, sell, or offer for sale, advertise, or publish, present or exhibit in any public place in this state any lithograph, moving picture, play, drama or sketch, which publication or exhibition portrays depravity, criminality, unchastity, or lack of virtue of a class of citizens, of any race, color, creed or religion which said publication or exhibition exposes the citizens of any race, color, creed or religion to contempt, derision, or obloquy or which is productive of breach of the peace or riots . . . "

Beauharnais was convicted of violating this statute on the basis of leaflets printed and distributed by the White Circle League of

---

an indication of the stringency of the overbreadth doctrine.

11. Prof. David Gutmann, Chief of the Psychology Division at Northwestern University, testified in detail on the psychological effect of racial slurs on members of groups, such as blacks and Jews, that have been the victims of prejudice and oppression. Defendants also presented the opinion testimony of leaders of

several ethnic groups. Prof. Gutmann was also of the opinion that the mere presence of plaintiffs in Skokie would have a severe harmful effect on Jewish survivors of World War II, but it is apparent that his views on this point are colored by his own interpretation of free speech and by his strong opposition to plaintiffs' political views.

America, of which he was president. The leaflets called on the Chicago government to "halt the further encroachment, harassment and invasion of white people, their property, neighborhoods and persons, by the Negro." It added that, "If persuasion and the need to prevent the white race from becoming mongrelized by the negro will not unite us, then the aggressions . . . rapes, robberies, knives, guns and marijuana of the negro, surely will."

Mr. Justice Frankfurter, writing for the Court, relied on two distinct grounds to uphold the statute and did not make clear the relationship between them. First, he noted that one traditional basis of criminal libel law was the punishment of words likely to cause breaches of the peace, and that the Illinois Supreme Court had characterized Beauharnais' words as "liable to cause violence and disorder". It then detailed Illinois' long history of racial strife and concluded that there was a rational basis for the state's attempt to suppress language likely to further exacerbate racial tensions. This analysis followed the fighting words rationale of *Chaplinsky* and *Cantwell.*

However, the case cannot be viewed simply as an application of the fighting words rule. There was no showing that the peaceful distribution of the leaflets had immediately threatened a breach of the peace or that those who distributed them had been belligerent or truculent. In fact, the indictment had charged simply that the publication exposed black Illinoisians to "contempt, derision, or obloquy"; there was no reference to the part of the statute which prohibited words "productive of breach of the peace or riots." Thus, considered as a fighting words case, *Beauharnais* would seem indistinguishable from *Cantwell,* in which a conviction based on the peaceful playing of a highly offensive phonograph record was reversed.

The Court then turned to a second ground for upholding the statute, which had not been relied upon by the Illinois Supreme Court. *See* 408 Ill. 512, 517–18, 97 N.E.2d 343 (1951). The Court noted that a second traditional purpose of criminal libel law was to protect the reputation of persons who were defamed by the libel. There was no question, the Court said, that it would be defamatory to call an individual a thief, rapist and drug user, and that such libel would be unprotected speech. It saw no reason to apply a different rule when the defamation was directed to an entire race, since "a man's job and his educational opportunities and the dignity accorded him may depend as much on the reputation of the racial and religious group to which he willy-nilly belongs, as on his own merits." 343 U.S. at 257–58, 263, 72 S.Ct. at 734. Therefore, the Court concluded, libel of racial and religious groups constituted a distinctive category of unprotected speech, and a showing of a danger of violence resulting from it was unnecessary. *Id.* at 266, 72 S.Ct. 725.

*Beauharnais* requires particularly close scrutiny for two reasons: first, because it is the sole Supreme Court case relied upon by defendants; and, second, because it is widely believed by First Amendment scholars that the case is no longer good law. The decision was originally accompanied by four powerful dissents. The dissenters ranged from Mr. Justice Black, who considered the statute unconstitutional on its face, to Mr. Justice Jackson, who objected only to the conduct of the trial; but all agreed on two points: that the government can constitutionally punish those who defame individual reputations or who incite breaches of the peace, and that Beauharnais had been punished for doing neither, but only for expressing his opinion. The case has since proven remarkably sterile as a source of constitutional law. So far as this court's researches have revealed it has never been relied on as controlling precedent in any Supreme Court case, and at least two circuit courts have stated in dicta that it is doubtful that the case is still good law. *Tollett v. United States,* 485 F.2d 1087, 1094 n. 14 (8th Cir. 1973); *Anti-Defamation League of B'nai B'rith v. FCC,* 131 U.S.App. D.C. 146, 403 F.2d 169, 174 n. 5 (D.C.Cir. 1968), *cert. denied,* 394 U.S. 930, 89 S.Ct. 1190, 22 L.Ed.2d 459 (1969) (Wright, J., concurring); *see also* T. Emerson, *The Sys-*

*tem of Freedom of Expression* at 396 (1970).

Nevertheless, the case has never been expressly overruled, and this court must make its own determination as to its continued validity. At the outset, there is no doubt that the case's basic premises are still sound: the government may punish speech which defames individual reputation, or which incites a breach of the peace. However, as has been seen, a statute directed at unprotected speech may still fall afoul of the First Amendment if it is so broad or vague that it unacceptably inhibits free debate. The standards which the courts apply in determining whether a particular statute has this inhibiting effect have undergone considerable evolution since *Beauharnais*, and much of the analysis the Court employed in that case is obsolete by modern standards. Thus, before it can be found that *Beauharnais* establishes the constitutionality of a law which, like the Skokie ordinances, employs similar language, it must be determined whether the *Beauharnais* statute itself would pass muster if it were brought before the Supreme Court today.

*Beauharnais* held that speech which defames racial groups may be criminally punished even when it is not directed at any specific member of the defamed group. There are two possible rationales for this holding. First, it may be presumed that defamation directed at a group damages the reputation of individual members of the

group. Second, speech which defames a race or religion may be considered so inherently productive of violence that it is unnecessary to show that it is used in a personally provocative manner.

The first rationale supports defendants' argument that the Skokie ordinance should be upheld because speech which incites racial hatred inflicts psychological trauma on individual members of the victim race. The court will assume for the sake of this discussion that this psychological trauma is a harm sufficiently serious to consider the speech which inflicts it to be unprotected.[12] Nevertheless, the court finds that this interpretation of *Beauharnais* is no longer tenable.

Beginning with *New York Times Co. v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), the Court has systematically restricted the power of the states to protect individual reputations through libel laws. In doing so, the Court has abolished several of the old common law rules of libel law on the grounds that the danger posed to free speech outweighs the states' need for such rules in order to protect the reputation of their citizens. *See Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 348–50, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974). The Court has abolished the rule that truth is a defense only when published with good motives and to a justifiable end. Truth is now an absolute defense to a libel suit, even when published for malicious purposes.[13] The rule

12. As defendants have pointed out, the development of actions for "mental outrage" and "intentional infliction of emotional distress" reflect a growing concern in state tort law for the serious character of purely mental and emotional injuries and the right of the victims of such injuries to compensation. *See Contrearas v. Crown Zellerbach Corp.*, 88 Wash.2d 735, 565 P.2d 1173 (1977); *cf. Knierim v. Izzo*, 22 Ill.2d 73, 174 N.E.2d 157 (1961). The federal courts should be hesitant to sweepingly invalidate state laws where narrower rulings will adequately protect constitutional rights. *See Cox Broadcasting Co. v. Cohn*, 420 U.S. 469, 487–89, 95 S.Ct. 1029, 43 L.Ed.2d 328 (1975).

13. *Garrison v. Louisiana*, 379 U.S. 64, 85 S.Ct. 209, 13 L.Ed.2d 125 (1964), required the defense of truth in libel suits concerning public

officials, and *Time, Inc. v. Hill*, 385 U.S. 374, 87 S.Ct. 534, 17 L.Ed.2d 456 (1967), extended the rule to a private plaintiff suing for a publication that cast him in a "false light" but did not defame him, when the subject matter of the publication was a matter of public interest. In abandoning the public subject-private subject distinction in libel actions, see note 14 *infra*, *Gertz* seemed to assume that truth was always a complete defense to a libel action. In *Cox Broadcasting Co. v. Cohn*, 420 U.S. 469, 95 S.Ct. 1029, 43 L.Ed.2d 328 (1975), the Court left open the possibility that damages could be recovered for a truthful publication concerning a matter of no public interest on an invasion of privacy, rather than libel, theory. It would appear, however, that the exception left open by *Cox Broadcasting* is a narrow one.

that a publisher is absolutely liable for the defamatory content of the matter published has also been abolished; a defamation plaintiff must now show that the publisher was at least negligent in failing to discover that the publication was false.[14] And finally, the Court has abolished the common law rule that if a publication is found by the court to be defamatory per se, the plaintiff need not prove that he had been damaged. The Court was held that damages must always be proven, and further has banned the award of punitive damages in civil actions.[15]

In the opinion of this court, the *Beauharnais* statute would now be considered unacceptable as a means of protecting reputations. The statute incorporated in some form all of these now-abolished common law libel principles. The trial court rejected a defense of truth, found that the pamphlets distributed constituted libel per se, and thus instructed the jury that the only question for them to resolve was whether Beauharnais had published the pamphlets. There was, of course, no finding of damage to any individual reputation. Moreover, the central theme of all the

Court's libel cases has been that the states may protect reputations only with laws that are actually necessary to accomplish that purpose without imposing too great a threat to the uninhibited flow of public debate. Criminal libel laws, and particularly group criminal libel laws, are virtually unknown in modern criminal codes, and can hardly be said to be essential to the protection of reputations. See 53 C.J.S. Libel and Slander §§ 11c, 290; *Garrison v. Louisiana*, 379 U.S. 64, 85 S.Ct. 209, 13 L.Ed.2d 125 (1964).

This conclusion is strengthened by the treatment *Beauharnais* has received in subsequent Supreme Court cases dealing with defamation.

In *New York Times*, the Court referred briefly to the *Beauharnais* statute as one which punished speech both defamatory *and* likely to cause violence. 376 U.S. at 268, 84 S.Ct. 710. Later in its opinion, the Court considered the problem of seditious libel, a common subject of early criminal libel prosecutions which consisted of speech inspiring disrespect for and hatred towards the government and public officials in the conduct of their duties. The Court concluded

14. The abolition of strict liability was a prophylactic measure designed to prevent publishers from censoring themselves through fear of large damage awards. In *New York Times*, the Court required public official to show "actual malice", specially defined as knowledge of falsity or reckless disregard for truth, before they could require damages for libel. In the ensuing decade, the Court wrestled repeatedly with the problem of publications which concern subjects of public interest but defame private individuals. *See Rosenbloom v. Metromedia, Inc.*, 403 U.S. 29, 91 S.Ct. 1811, 29 L.Ed.2d 296 (1971). Finally, in *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974), the Court compromised by returning to the *New York Times* rule for public officials and requiring at least negligence in all other actions.

15. *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 349, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974). *Gertz* left open the possibility that presumed and punitive damages could be awarded on a showing of *"New York Times"* malice, see note 14 *supra*, but this form of "malice" consists only of the intentional or highly reckless use of false and defamatory material. Malice in the sense of a deliberate intent to injure is not an acceptable basis for the punishment of

libel. *Garrison v. Louisiana*, 379 U.S. 64, 85 S.Ct. 209, 13 L.Ed.2d 125 (1964).

Of course, *Gertz* dealt only with civil libel, and the Court has never specifically held that actual damage must be proven in criminal libel cases. However, the dominating theme of these cases has been the Court's concern for limiting libel laws to cases in which they are actually necessary for the protection of reputation, and it has consistently taken a pragmatic approach to determining whether a particular type of law is actually necessary. *See Garrison v. Louisiana*, 379 U.S. 64, 85 S.Ct. 209, 13 L.Ed.2d 125 (1964), discussed in text *infra*. In fact, an argument could be made based on *Gertz* and *Garrison* that all criminal libel laws designed only to protect reputation are unnecessary and excessively restrictive of speech, and should be considered unconstitutional. Such a position would strongly imply that any criminal law designed to punish the infliction of psychological trauma through speech such as racial slurs is unconstitutional, and that the victim should be limited to his tort law remedy. Resolution of this question is not necessary in this case, and the court expresses no opinion on it.

that seditious libel prosecutions are per se unconstitutional, and further that the government may not presume that criticism of official government policies will automatically reflect on the personal reputations of the responsible public officials. *Id.* at 273–77, 290–92, 84 S.Ct. 710. There can be no question that races and religions have been and are the subject of legitimate debate, and the Court's reasoning casts considerable doubt on the propriety of presuming damage to individual members of a group from criticism of the group. All the *Beauharnais* dissenters noted the parallels between that case and seditious libel prosecutions. *See also Anti-Defamation League v. FCC, supra,* 131 U.S.App.D.C. at 150–151, 403 F.2d at 173–74 (Wright, J., concurring).

The following term, the Court extended *New York Times* to criminal laws punishing libel of individuals in *Garrison v. Louisiana,* 379 U.S. 64, 85 S.Ct. 209, 13 L.Ed.2d 125 (1964). It began by noting that the original functions of criminal libel law—preventing breaches of the peace and protecting reputations—had been supplanted by the victim's tort law remedy early in our legal history, leaving the criminal law primarily as a weapon against seditious libel. The Court went on to say that libel laws are almost unknown in modern criminal codes, and their usefulness is highly questionable, except in controlling speech which threatens to disturb peace and order. The Court gave the *Beauharnais* statute as an example, describing it as "narrowly drawn" and "designed to reach speech, such as group vilification, 'especially likely to lead to public disorders.'" Thus, it appears that after *New York Times* and *Garrison,* the Court views speech which defames racial and religious groups merely as a special category of language likely to cause breaches of the peace.

Punishment for racial slurs directed at large groups poses even greater threats to free speech than punishment for group libel. Libel is a well understood legal concept, with a carefully defined and limited meaning. It consists of false speech which damages a person's reputation. Racial slurs are not so well defined, at least at this stage of development of the law, and the psychological trauma which they may cause is much more difficult to identify and prove than damage to reputation. It is particularly difficult to distinguish a person who suffers actually psychological trauma from one who is only highly offended, and the Court has made it clear that speech may not be punished merely because it offends.

In summary, the court concludes that insofar as *Beauharnais* held that speech which defames racial and religious groups may be restricted in order to protect the reputation of individual members of such groups, it has been overruled, or at the very least has been so severely undermined that it should not be extended to new kinds of speech-inflicted damage to individuals, where such an extension would pose a substantial danger of inhibiting free speech and debate. Thus, the first interpretation of *Beauharnais* cannot save Ordinance # 995.

The question remains whether the ordinance can be supported by the second possible interpretation of *Beauharnais*: that fighting words need not be used in a personally abusive manner when they consist of language which defames a race or religion. The fact that *New York Times* and *Garrison* restated *Beauharnais* along these lines instead of completely overruling it gives support to this interpretation. However, neither of those cases squarely faced the question of whether *Beauharnais* could still be supported on this ground, and, as discussed above, all the modern authority rejects the theory that even unprotected speech may be prohibited solely on the basis of its inherent tendency to cause violence. *Cohen, supra; Gooding, supra; Tinker, supra.* If *Beauharnais* is still good law, racial and religious defamation is the only exception to this rule. It seems doubtful that such language is so extremely likely to cause violence as to justify this exception, and it is noteworthy that the Court has many times considered cases involving language which defamed races or religions without giving any indication that such an

exception exists. *See, e. g., Brandenburg v. Ohio, supra; Carroll v. President and Commissioners of Princess Anne*, 393 U.S. 175, 89 S.Ct. 347, 21 L.Ed.2d 325 (1968).

 The actual holding of *Beauharnais* was that the prohibition of language which defames races or religions bore a rational relation to the state's goal of preventing violence and disorder. However, the Court has since abandoned the rational relation to purpose approach to First Amendment cases, and now requires that laws which restrict free speech and assembly be necessary to achieve compelling state purposes.[16] *See, e. g., NAACP v. Button*, 371 U.S. 415, 438–44, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963). Accordingly, the court concludes that if the Supreme Court were faced today with the question of whether a statute like that in *Beauharnais* is an acceptable means of preventing breaches of the peace, it would apply ordinary fighting words analysis. *See Ashton v. Kentucky*, 384 U.S. 195, 86 S.Ct. 1407, 16 L.Ed.2d 469 (1966). The court has already concluded that Ordinance # 995 cannot survive such analysis. Alternatively, if the court is wrong in concluding that *Beauharnais* has been overruled, at the very least it has been undermined so severely that it should be restricted to its facts. The statute in that

case had been authoritatively construed to require findings that the speech involved fall within the technical definition of libel and that it be of a character likely to inspire a breach of the peace. The Skokie ordinance is not so limited.[17]

### E. The Possibility of a Narrowing Construction

Finally, the defendants argue that even if the ordinance is vague and overbroad, it is susceptible to a narrowing construction readily available in the state court, *Young v. American Mini Theatres, Inc.*, 427 U.S. 50, 60–61, 96 S.Ct. 2440, 49 L.Ed.2d 310 (1976), and thus should not be declared unconstitutional on its face.

 Whether a statute is susceptible to a narrowing construction is primarily a question of state law and legislative intent, rather than constitutional law. A federal court should not find a statute to be susceptible to a narrowing construction merely because it believes that the state courts would also consider the statute unconstitutionally broad as drafted. Where it appears that a statute was actually intended to be as broad as it appears, and where it is defended on such broad grounds, it should not be considered subject to a narrowing

---

**16.** The analysis in *Beauharnais* is also obsolete in that the Court seemed to assume that its only options were to permit the state to ban racial defamation completely or to require a showing of clear and present danger of violence in every case. At the time of *Beauharnais* the concept of clear and present danger was still developing, and it was unclear whether it applied at all in unprotected speech cases. See the discussion in Justice Jackson's *Beauharnais* dissent, 343 U.S. at 302–04. *Brandenburg* and *Cohen* have since made clear the distinction between speech that causes a danger of imminent violence and that which is used in a personally abusive manner.

**17.** Defendants have also argued that the ordinance may be supported because advocacy of racial hatred within Skokie would disrupt the Village's efforts to achieve racial integration, and in particular would disrupt its public housing program. They rely on *Chicago Real Estate Board v. City of Chicago*, 36 Ill.2d 530, 552–53, 224 N.E.2d 793 (1967), in which the Illinois Supreme Court upheld Chicago's ban on "panic peddling" and "block busting" real estate buy-

ing practices against a First Amendment challenge. The court found that real estate dealers' practice of inducing property owners to sell their homes through fear of reductions in property value caused by racial minorities moving into a neighborhood was an integral part of discriminatory and illegal conduct, and thus was not "pure speech". The court's ruling was based on the principle, first established in labor picketing cases, that speech which is inextricably combined with some form of action, such as economic coercion, may be restricted in the course of regulating the conduct. Unlike the real estate brokers involved in *Chicago Real Estate Board*, plaintiffs are engaged in no conduct which could affect Skokie's housing program other than their speech. The mere fact that plaintiffs' speech may delay the implementation of one of Skokie's policies does not justify restricting it. Opposition to government policy is a primary purpose of free speech, and public housing programs, however beneficial they may be, have no talismanic immunity from public criticism and debate.

construction just because the court can think of an interpretation which would save it. *See Erznoznik v. City of Jacksonville,* 422 U.S. 205, 215–16, 95 S.Ct. 2268, 45 L.Ed.2d 125 (1975).

Defendants have not suggested any specific narrow interpretation which would rescue this ordinance. The gist of the court's analysis is that the ordinance is defective in that it is not limited to uses of racial slurs in a personally abusive or inciting manner, in situations where they either threaten to cause a breach of the peace or to inflict psychological harm on an identifiable victim. The extreme breadth of the definition of dissemination of materials in the ordinance convinces the court that it was not intended to be restricted to such situations, and defendants have not suggested that there is any state law which would require it to be so restricted.[18] The court concludes that Ordinance # 995 is not readily susceptible to a narrowing construction, and is, for the reasons discussed above, unconstitutional on its face.

### F. Ordinance # 994

Insofar as § 27–56(c) of Ordinance # 994 would deny a permit to a public assembly merely because the participants will use speech likely to incite hatred or hostility toward a race or religion, the ordinance's unconstitutionality follows from the discussion of # 995 above. However, the language of § 27–56(c) is not as clearly vague and overbroad as the comparable language of # 995. It refers specifically to words which "portray criminality, depravity or lack of virtue", and also to the incitement of violence. Despite this narrower definition of the prohibited speech, § 27–56(c) is also unconstitutional. Unlike Ordinance # 995, § 27–56(c) does not merely punish speech after it is spoken, but requires a person to obtain permission before he may speak at all. It is, in other words, a prior restraint on the content of speech.

Any content-based prior restraint bears a heavy presumption of unconstitutionality. *Organization for a Better Austin v. Keefe,* 402 U.S. 415, 419–20, 91 S.Ct. 1575, 29 L.Ed.2d 1 (1971); *New York Times Co. v. United States,* 403 U.S. 713, 91 S.Ct. 2140, 29 L.Ed.2d 822 (1971). The distinction between prior restraints and criminal sanctions is based on:

> "a theory deeply etched in our law: a free society prefers to punish the few who abuse rights of speech *after* they break the law than to throttle them and all others beforehand. It is always difficult to know in advance what an individual will say, and the line between legitimate and illegitimate speech is often so finely drawn that the risks of freewheeling censorship are formidable." *Southeastern Promotions, Ltd. v. Conrad,* 420 U.S. 546, 559, 95 S.Ct. 1239, 1246, 43 L.Ed.2d 448 (1975) (emphasis in original).

This particular prior restraint fails to overcome the presumption of unconstitutionality for three reasons. First, the "risks of freewheeling censorship" are particularly high. As discussed above, the distinction between protected and unprotected speech in this area is very hard to draw, and the evidence in this case shows clearly that plaintiffs' opinions are so unpopular in Skokie that it is highly doubtful that Village officials would issue a permit under any circumstances. Second, defendants' admission that there is no clear and present danger that the kind of speech prohibited by this ordinance would cause violence and disorders in the Village severely undercuts the Village's need for a prior restraint.

And finally, the permit system lacks adequate procedural safeguards. The Supreme Court has many times emphasized the necessity of providing a fair hearing and prompt judicial review in any proce-

---

18. The Illinois courts appear to have interpreted *Beauharnais* to permit the state to ban racial "propaganda", an interpretation which this court finds to be unconstitutionally broad. *See Chicago Real Estate Board v. City of Chicago,* 36 Ill.2d 530, 552–53, 224 N.E.2d 793 (1967);

*Village of Skokie v. National Socialist Party,* 51 Ill.App.3d 279, 293, 9 Ill.Dec. 90, 366 N.E.2d 347 (1st Dist. 1977). The Illinois Supreme Court's decision vacating the injunction sustained in the latter case did not discuss *Beauharnais.*

dure which imposes a prior restraint on speech. *See Carroll v. President and Commissioners of Princess Anne*, 393 U.S. 175, 89 S.Ct. 347, 21 L.Ed.2d 325 (1968); *cf. Freedman v. Maryland*, 380 U.S. 51, 85 S.Ct. 734, 13 L.Ed.2d 649 (1965). Ordinance # 994 includes no guaranteed hearing, and there is no assurance that an applicant will be given an adequate opportunity to present his case. If a permit is denied, the only way for the applicant to obtain judicial review is to bear the expense and risk of filing suit to compel issuance of the permit. Accordingly, the court finds that, in addition to being vague and overbroad, § 27–56(c) is unconstitutional as a prior restraint which unnecessarily restricts First Amendment rights.

## V. *The Military Uniforms Ordinance*

Section 28–42.1 of Ordinance # 996 provides that:

> "No person shall engage in any march, walk or public demonstration as a member or on behalf of any political party while wearing a military-style uniform."

A political party is defined to include any organization existing primarily to influence government or politics, § 28–42.2; military-style uniform is not defined. As with Ordinance # 995, violation is a misdemeanor punishable by a $500 fine and/or six months imprisonment, § 28–42.4, and the Corporation Counsel is authorized to seek injunctive relief against potential violations, § 28–42.3.

It is obvious that this ordinance is directed specifically at Nazi uniforms and regalia. If Skokie really meant to enforce the ordinance as written, it would prohibit, among other things, an appearance by members of the American Legion in support of the candidates of the Democratic or Republic party. Nevertheless, for the purposes of this case, the court must assume that the Village meant what it said and analyze the ordinance as ·it is written.[19]

The use of symbolic forms of expression, including the wearing of distinc-

tive clothing, is protected by the First Amendment. *Spence v. Washington*, 418 U.S. 405, 94 S.Ct. 2727, 41 L.Ed.2d 842 (1974); *Tinker v. Des Moines Independent Community School District*, 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969); *Stromberg v. California*, 283 U.S. 359, 51 S.Ct. 532, 75 L.Ed.2d 1117 (1931). This ordinance therefore imposes a restriction based on the content of "speech" and must be supported by compelling governmental interests. The only reasons offered to support the ordinance are stated in the preamble: the wearing of military-style uniforms is "repugnant" both to the "tradition of civilian control of government" and to "standards of morality and decency of the people of the Village of Skokie." Defendants have sought to offer no other rationale for the ordinance.

Both justifications are patently insufficient. As discussed at length above, the First Amendment embraces the freedom to advocate even that the government ought to be violently overthrown, let alone that it ought not to be controlled by civilians. Thus the banning of a symbol which is repugnant to a "tradition" which all Americans are free to reject and openly criticize is clearly unconstitutional. The reference to Skokie's standards of decency and morality is apparently an attempt to invoke the "community standards" test applied in obscenity cases, *Miller v. California*, 413 U.S. 15, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973). However, to be obscene, speech must in some way be erotically stimulating, *Cohen, supra*, 403 U.S. at 20, 91 S.Ct. 1780. Plaintiffs' wearing of uniforms is political speech, which, as the Court has often emphasized, "need not meet standards of acceptability." *Organization for a Better Austin v. Keefe, supra*, 402 U.S. at 419, 91 S.Ct. at 1578. The court finds Ordinance # 996 to be patently and flagrantly unconstitutional on its face, and there is no need to consider the prior restraint issue posed by its enforcement through Ordinance # 994.

---

**19.** The court expresses no opinion on whether Nazi uniforms could be banned by a properly drawn statute, but it is clear that to the extent it is intended to accomplish this purpose, the present ordinance is hopelessly overbroad.

## VI. *Injunctive Relief*

Plaintiffs have requested a declaratory judgment that the three ordinances are unconstitutional, an injunction against their enforcement, and general injunctive relief against further efforts by defendants to prevent plaintiffs from exercising their First Amendment rights in Skokie. For the reasons discussed above, plaintiffs are entitled to the declaratory relief under *Steffel v. Thompson*, 415 U.S. 452, 94 S.Ct. 1209, 39 L.Ed.2d 505 (1974).

In *Younger v. Harris*, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971), the Court held that the federal courts may not enjoin an ongoing state criminal prosecution on the grounds that the statute involved is unconstitutional, both in the interests of federalism and comity and because the defendant ordinarily has an adequate remedy in the presentation of his constitutional arguments to the state court which is trying him. The only exceptions are where the criminal prosecution is the result of bad faith harassment by local law enforcement officials or the statute involved is in its entirety "patently and flagrantly violative of express constitutional prohibitions."

*Steffel* held that declaratory relief could still be sought where the federal action is commenced before the state prosecution actually begins. It did not deal expressly with the question of whether the federal courts may *enjoin* state criminal prosecutions before they are begun, but it stressed heavily the differences between declaratory and injunctive relief. The Court pointed out that declaratory judgments have a less intrusive effect on the operation of the state courts; that a showing of no adequate remedy at law has never been required as a prerequisite to the granting of declaratory relief; and that a declaratory judgment that a state law is vague or overbroad leaves open the possibility that prosecutors may make a good faith effort to obtain a narrowing construction in state court without risking contempt sanctions. 415 U.S. at 468–73, 94 S.Ct. 1209. Since *Steffel*, it appears that a plaintiff who wishes to enjoin a threatened state criminal proceeding must make an extraordinary showing of need, but the requirement is not quite as strict as that required by *Younger* when the state proceeding has actually begun. *See Wooley v. Maynard*, 430 U.S. 705, 711–12, 97 S.Ct. 1428, 51 L.Ed.2d 752 (1977).

 Applying these principles, the court finds that plaintiffs are entitled to an injunction against enforcement of # 996, which is clearly and patently unconstitutional in its entirety. The same cannot be said of # 995, which has been found unconstitutional on vagueness and overbreadth grounds. Moreover, there is no evidence in this case of bad faith harassment on the part of defendants, with the possible exception of their enactment of Ordinance # 996. Although it is apparent that Skokie and its officials are strongly opposed to plaintiffs' presence in the Village, it appears to the court that defendants believe in good faith that plaintiffs' activities are not protected by the First Amendment. In seeking to block the proposed demonstration, defendants have acted entirely through proper legal channels, and the court takes notice that they have been commendably prompt and cooperative in submitting the issues involved in this case for judicial resolution. Accordingly, the court finds no grounds for enjoining # 995 which would satisfy *Younger*. The court also finds that plaintiffs have shown no need for an injunction against "interference" with their rights in general.

 Different considerations apply in the case of Ordinance # 994. *Younger* applies only to judicial or quasi-judicial proceedings, not to the decisions of municipal officers whether to grant permits. As to # 994, therefore, plaintiffs must only meet the ordinary prerequisites for injunctive relief. If this court denies an injunction and defendants deny plaintiffs a permit, plaintiffs must either demonstrate without one and risk criminal sanctions or bring an entirely new action to compel issuance of a permit. Neither of these options is an adequate remedy at law. Furthermore, there would inevitably be a considerable delay, and the Seventh Circuit has recently held

that "even the temporary deprivation of First Amendment rights constitutes irreparable harm in the context of a suit for an injunction." *Citizens for a Better Environment v. City of Park Ridge,* 567 F.2d 689 at 691 (1975). Plaintiffs have made an adequate showing of need for injunctive relief as to the unconstitutional provisions of Ordinance # 994.

In resolving this case in favor of the plaintiffs, the court is acutely aware of the very grave dangers posed by public dissemination of doctrines of racial and religious hatred.

In this case, a small group of zealots, openly professing to be followers of Nazism, have succeeded in exacerbating the emotions of a large segment of the citizens of the Village of Skokie who are bitterly opposed to their views and revolted by the prospect of their public appearance.

When feelings and tensions are at their highest peak, it is a temptation to reach for the exception to the rule announced by Mr. Justice Holmes, "if there is any principle of the Constitution that more imperatively calls for attachment than any other it is the principle of free thought—not free thought for those who agree with us but freedom for the thought that we hate." [20]

Freedom of thought carries with it the freedom to speak freely and to publicly assemble to express one's thoughts.

The long list of cases reviewed in this opinion agrees that when a choice must be made, it is better to allow those who preach racial hate to expend their venom in rhetoric rather than to be panicked into embarking on the dangerous course of permitting the government to decide what its citizens may say and hear. As Mr. Justice Harlan reminded us in *Cohen,* where a similar choice was made, "That the air may at times seem filled with verbal cacophony is . . . not a sign of weakness but of strength." The ability of American society to tolerate the advocacy even of the hateful doctrines espoused by the plaintiffs without

abandoning its commitment to freedom of speech and assembly is perhaps the best protection we have against the establishment of any Nazi-type regime in this country.

IT IS HEREBY ORDERED that final judgment enter in this cause as follows:

(1) Section 27–54, 27–56(c), 27–56(j), 28–42 through 28–42.5, both inclusive, and 28–43 through 28–43.5, both inclusive, of the Code of Ordinances of the Village of Skokie, Illinois, as amended by Village Ordinances # 77–5–N–994, # 77–5–N–995 and # 77–5–N–996, and each of said sections, are hereby found and declared to be inconsistent with the First and Fourteenth Amendments to the United States Constitution, and therefore unenforceable and void; and

(2) Defendants, and each of them, together with their officers, agents, employees, successors in office, and all persons acting in concert with them or under their direction, are hereby permanently enjoined from:

(a) Enforcing against plaintiffs any of Sections 27–54, 27–56(c), 27–56(j), or 28–42 through 28–42.5, both inclusive, of said Code of Ordinances; or

(b) Denying to plaintiffs any permit necessary to hold a public assembly within the Village of Skokie solely on the grounds of expected violations of any ordinance declared to be unconstitutional in this Order.

---

**20.** *United States v. Schwimmer,* 279 U.S. 644, 654–55, 49 S.Ct. 448, 451, 73 L.Ed. 889 (1929) (Holmes, J., dissenting).